# THE STATE ex rel. HENRY W. KIEL et al. v. GEORGE W. RIECHMANN et al.

### In Banc, December 23, 1911.

1. **PARTY COMMITTEES: Change of Officers.** Under the statutes a party committee in St. Louis has power to remove its chairman and other officers at any time during the two-year period for which committeemen are elected, and to elect others in their stead. Such officers do not have a fixed statutory tenure.

2. ————: ————: **Committee's Own Construction.** A construction placed upon the statute by a party committee at a time when it was free from factionalism, by the adoption of rules prescribing the conditions for removing the committee's officers, is not binding upon the court, but is persuasive, and demonstrates that the contention that the committee has no power to change its officers is an afterthought.

3. ————: **Amending Rules: At Regular Meeting.** Where a special meeting of the party committee was regularly called for July 26th, and at that meeting resolutions amending the rules were presented, to lie over till the next meeting, as the rules required, and the committee adjourned to meet again on August 2d, and the rule then in force provided that "the regular meetings of the committee shall be held at headquarters pursuant to adjournment," the meeting held on August 2d was a "regular meeting," since "pursuant to adjournment."

4. ————: ————: **By Majority Where Rule Required Three-Fourths.** Where a majority have power to make rules for the government of a party committee, a majority have power subsequently to alter or abrogate the rules, although the existing rule declared that three-fourths were necessary to change the rules. Where the statutes authorized the party committee to make rules for its own government, but did not say by what percentage of members such rules should be made, a majority may make rules, and if they adopt a rule declaring that the rules cannot "be repealed or amended unless by a three-fourths majority vote of all members," a majority can subsequently amend that rule, and having amended it can amend any other.

5. ————: ————: **By Majority of Quorum.** Where the statutes do not themselves prescribe what number of the governing body shall constitute a quorum for the transaction of business, the

239 Sup.—6

State ex rel. v. Riechmann.

common law fixes a quorum at a majority of its members, and such quorum has the full power of the whole body or quorum, and a change in its rules made by a majority of those present, such a majority constituting a quorum, is valid and legal.

6. ———: Eligibility of Committeeman: Majority Determines: Removal of Officers. Where the rule of the committee required the affirmative vote of 15 of the 28 members elected, to remove its officers, a determination by a majority of those present (14 to 11), a majority of the whole being present, that a certain other committeeman who was present had a right to vote, was all the law required; and if after they had determined that he was entitled to vote, he did vote, thereby making the number voting for removal 15, the removal was legal. And when the secretary refused to include the name of this committeeman in his roll-call, and was sustained by the chairman, and an appeal was taken from the chairman's ruling and he was overruled by a vote of 14 to 11, that was a determination by a majority of a quorum that the committeeman had a right to vote.

7. ———: Removal of Chairman: Election of Successor: Majority. Where the rule of the committee required the affirmative vote of 15 of the 28 elected committeemen to remove the chairman, but is silent on the question of the number necessary to elect a successor, a majority of a quorum is sufficient to elect a successor to a chairman who has been removed by 15 votes, though the number voting for the successor is less than 15.

8. ———: Certiorari: Inappropriate. Held, by KENNISH, J., with whom VALLIANT, C. J., and BROWN, J., concur, that the writ of certiorari will lie only against judical or quasi-judicial bodies, and will bring before the court for review only such records as are judicial in their character, and the actions and proceedings of a political committee are not of that character; and this canon of common-law procedure has not been changed by the statute, Sec. 6530, R. S. 1909. Where the controversy is not to protect the title of a committeeman elected by the voters, but to determine who is the rightful chairman, secretary and treasurer of the committee, it should be left to the State committee of the party to determine, and the courts should not by certiorari undertake to interfere with the committee's internal affairs.

## Certiorari.

WRIT QUASHED.

*Charles W. Bates* for relators.

(1)   The Republican City Central Committee has no power, jurisdiction or authority to remove any of its officers after the organization of the committee by election of such officers under the provisions of Sec. 5880, R. S. 1909. State ex rel. v. Miles, 210 Mo. 127; See State ex rel. v. Lucas, 236 Mo. 18.   (2)   Wm. Troll, by permanently removing from the ninth ward, vacated his office of Ninth Ward Committeeman and was no longer entitled to a seat or vote in the committee. R. S. 1909, sec, 5880; People v. Ballhorn, 100 Ill. App. 571; Republica v. McRain, 5 Yeats (Pa.) 400; Commonwealth v. Yeakel, 13 Pa. Co. Rep. 616; Chew v. Justices, 2 Va. Cases, 208; Town of Acworth v. Lynchborough, 2 N. H. 296; Barry v. Greenwich, 1 Pick. 134; State ex rel. v. Allen, 21 Ind. 516; State ex rel. v. Jones, 19 Ind. 536; People v. Britt, 55 Cal. 79.   (3)   The committee may make by-laws, not contrary to or inconsistent with law.   Valid rules and by-laws of the committee are binding on it and its members, and action taken in violation thereof against the objection of relators is illegal and will be so declared by the courts in protecting the rights of relators and others who so objected. State ex rel. v. Miles, 210 Mo. 127; R. S. 1909, sec. 6033, subd. 2; Barry v. Baker, 1 Allen (Mass.) 120; Hill v. Mining Co., 119 Mo. 26; Hoelreiter's Appeal, 93 Pa. St. 479; Weatherby v. Medical Society, 76 Ala. 567; Cummings v. Webster, 43 Me. 192.   (4)   So much of the rules as provide that the chairman and other officers of the committee may be removed is contrary to the statutes and void. See point one.   (5)   So much of the rules as provide that the rules can not be amended, except by vote of three-fourths majority of the members, and except motion for that purpose be made at a meeting prior to one at which proposed amendments shall be voted on, is valid.   (6)   Where the term of office is definite, the

power to remove does not inhere in the body making the appointment. In such a case, express power to remove must be granted or it cannot be exercised, and if granted, removal can be had only for cause, which carries with it the right of the officer to have charges preferred against him, notice thereof and an opportunity to defend. 23 Am. & Eng. Ency. Law (2 Ed.), 437-438. State ex rel. v. Knott, 207 Mo. 167; State ex rel. v. Maroney, 191 Mo. 531. (7) The right or title to an office is a property right, a privilege and a franchise, which no one but the State can take away, except in the methods provided by law. The right to the office is good against all the world except the State.

*W. C. Marshall* for respondents.

(1) The relators' contention is: That the tenure of office of the officers is for the full life of the committee; and, hence, the removal of the old officers and the reorganization of the committee is illegal. This contention is wholly untenable. Sec. 5880, R. S. 1909. Nothing is said about the tenure of the officers in this section. The tenure of the officers is nowhere fixed except in rule 1, where in it is provided that the officers shall hold office during the life of the committee, provided, however, that any or all of said officers may be removed by a vote of eighteen of the twenty-eight members of the committee. This rule was repealed and a new rule adopted by the committee, allowing the officers to be removed by a majority vote of the elected members, before the old officers were removed. So that they were removed in strict compliance with the rules of the committee that were then in force, and, therefore, their removal and the election of the present officers was perfectly regular and legal. But even if they had been removed in manner contrary to rule 1, as originally adopted, the removal would be legal. For the majority of the committee had a right, in the

first instance, to adopt rules, and as those rules were only made for the government of the committee, they could repeal, alter or amend the rules by a majority vote at any time, or the majority could act in disregard of the rules, and their action would be legal, for it expressed the will of the majority, and under our form of government the will of the majority prevails. State ex rel. v. Alt, 26 Mo. App. 673; See 29 Cyc. 1689, Mason v. Byrloy, 84 S. W. 767; Boisot on By-Laws, sec. 18; Richardson v. Congregational Society, 58 N. H. 187; Heyter v. McLaughlin, 106 Ky. 509; Dillon on Municipal Corporations (5 Ed.), sec. 521; Heiskel v. Mayor of Baltimore, 65 Md. 125; Leiber v. Railway, 84 Md. 304; Barrett v. Mayor, etc., 48 N. J. L. 395; Outwater v. Carlstart, 66 N. J. L. 510; Tappan v. Long Branch Pol. Comr., 59 N. J. L. 317; State v. Archibald, 8 N. D. 359.

GRAVES, J.—This is a contest between two contending factions of the Republican City Committee of the city of St. Louis. By our writ of *certiorari* we have before us in the returns made the records of the doings of such committee from its organization up to a time when an attempt was made to change the officers thereof. The relators, and the respondent George W. Galloway, belong to the minority faction of the committee, and the respondents, except Galloway, belong to the majority faction. Relators seek to have this court quash the records of the meetings of said committee as such records were made at several meetings to be presently mentioned.

The committee is composed of twenty-eight members who were elected in August, 1910, under the provisions of the primary law with reference to the election of party committees. There is one member for each of the twenty-eight wards of the city. After the State primary in August, 1910, the several members of this committee, including the relators and respond-

ents herein, having received their certificates of election, met for the purpose of organizing the committee and electing the officers thereof. This was August 9, 1910. At such meeting, the following officers were duly elected, viz.: Henry W. Kiel, chairman; Peter Anderson, vice-chairman; George W. Galloway, secretary; Edmond Koeln, treasurer, and Herman Bader, sergeant-at-arms. These parties continued as officers until August 4, 1911, when their offices were declared vacant, and this action is the chief matter in issue here.

To change the officers it became necessary to change some of the rules of the committee, thus: Rule 1 formerly provided that officers should hold office during the life of the committee (two years), but further provided that they could be removed by not less than eighteen votes of the twenty-eight members after ten days' notice had been served upon all the members of the desired removal of the officer, by the secretary of the committee, and was amended so as to read:

"Rule 1. The committee shall organize by electing by ballot a chairman, vice-chairman, secretary, treasurer and sergeant-at-arms. They shall hold office during the continuance of the committee; provided, however, that any or all of said officers may be removed by not less than fifteen votes, elected members, of the twenty-eight members of the committee."

Rule 2 was not amended, but as it may be material, we quote it thus:

"Rule 2. The regular meetings of the committee shall be held at headquarters pursuant to adjournments."

Rule 3 formerly read:

"Rule 3. Special meetings may be called by the chairman or on written request of seven members of the committee, or by order of the executive committee, due notice of such meetings shall be given to each member of the committee."

This was amended, so as to read:

"Rule 3. Special meetings may be called by the chairman or seven members of the committee. or by order of the executive committee. Notice of such meetings shall be given to the members by the chairman, or the seven members calling the meeting, or by the executive committee, as the case may be."

The last paragraph of Rule 4 formerly read:

"The vice-chairman shall preside over the committee during the absence of the chairman and perform his duties, and in the absence of both, the committee shall elect a chairman to preside at that meeting."

This was amended, so as to read:

"The vice-chairman shall preside over the committee during the absence of the chairman and perform his duties."

Rule 15 formerly read:

"Rule 15. None of the foregoing rules shall be repealed or altered unless by a three-fourths majority vote of all the members, nor unless upon motion made in writing for that purpose at a previous meeting of the committee."

This was amended to read:

"Rule 15. None of the foregoing rules shall be repealed or altered unless by a majority vote of all the members elect, nor unless upon motion made in writing for that purpose at a previous meeting of the committee."

The right to make these amendments as they were made is a matter also challenged by retators, and the method of making the change we shall give next.

July 22, 1911, seven members of the committee requested the chairman, Mr. Kiel, to call a meeting of the committee for July 26th, and this was done. At this meeting all members were present except L. C. Dyer of the 16th Ward, but he had a proxy present. The secretary declined to call the 9th Ward of which

William Troll, then present, had been elected as the member. Troll's right to vote becomes a question, and the facts will be noted at the proper time in the course of the opinion. At this meeting the folowing resolution was adopted by vote of 14 to 12:

"Resolved, That when this committee adjourn we adjourn to meet in regular meeting at headquarters of the Republican City Central Committee, at 8 p. m. Wednesday, August 2, 1911."

An effort was made to amend the resolution so as to have the meeting August 9th, but the amendment was lost. The chairman declared that there was a vacancy in the 9th Ward, such action being taken upon the statement made by the secretary that Mr. Troll had moved from the 9th Ward to the 6th Ward. Before the ruling of the chair, the secretary asked Mr. Troll if he had not moved from the 9th to the 6th Ward, and the secretary says in his return here that the response of Troll was, "Yes," whilst the other return says Mr. Troll said, "Yes, but I claim my residence in the 9th Ward," or words to this effect.

Troll protested against the action of the chairman in declaring that there was a vacancy in the 9th Ward. Mr. Polito then moved by appropriate resolution to amend the rules as above indicated, and further moved that the amendments lie over for one week and be voted upon at the meeting to be held August 2nd. The chairman ruled that the amendments and motion were out of order, because they could be presented only at a regular meeting and not at a special meeting, and because they conflicted with Rule 16. From this ruling of the chair an appeal was taken and the vote stood 12 to sustain the chair and 14 against. The appeal was sustained and the resolution received. At this juncture the meeting adjourned.

Pursuant to the resolution first stated above, on August 2d the committee again met with all present, except Dyer of the 16th. Ward, but he had a proxy

present. At this meeting the secretary omitted to call the 9th Ward, for the reasons stated in the previous meeting. Troll appealed from the decision of the chairman, and his appeal was sustained by vote of 14 to 12. Motion was made that Troll be allowed to vote and this motion the chairman ruled out of order. Upon appeal being taken, the chairman failed to be sustained with a vote of 12 to sustain the ruling and 14 against. There then came a motion to amend the minutes of July 26th thus:

"Correction be made in the minutes of July 26th, that immediately upon the secretary protesting the Ninth Ward as being present Mr. Seaman moved, that Mr. Troll be permitted to vote and be recorded as present. The chairman overruled said motion; a decision (appeal) from the chair was taken and on roll-call the chair was not sustained. Also that minutes show that on roll-call meeting adjourned to August 2d."

Objection was made to this amendment and the chairman sustained the objection, but again upon appeal the chair was not sustained. The chairman after being overruled, instructed the secretary to record the vote on the motion to amend as, yeas 15, and nays 12.

At this point it was moved that the proposed amendments to the rules be taken up for consideration. The chairman ruled the motion out of order, because the present meeting was a continued special meeting and not a regular meeting, and because the amendments conflicted with rules 15 and 16. An appeal was taken and the chair overruled by vote of 14 to 12. Again objection was made to the omission of the 9th Ward from the roll-call, which objection the chairman overruled. Appeal being taken, the chairman was again overruled by vote of 14 to 12, and the chairman then directed the secretary to record the vote on the motion as yeas 15, nays 12.

State ex rel. v. Riechmann.

Finally Mr. Polito moved that Rule 1 be amended as we have hereinbefore indicated. The chairman declared the motion out of order. Appeal being taken the chair was overruled. On this vote the 9th Ward was again omitted on roll-call and upon objection being made the chairman overruled the objection. Upon appeal from this ruling the chair was not sustained, as usual. The motion to amend the rule was then put, the vote being yeas 14, nays 12. The chairman declared the motion lost for reasons stated, but upon appeal the chairman was overruled. Again protest was made against not calling the 9th Ward, and protest overruled, and appeal taken with the result that the chairman was overruled. After being overruled on this matter the chairman then directed the secretary to record the vote on the motion to amend as 15 yeas to 12 nays. The same process was gone through as to the other amendments. The meeting of August 2d adjourned before going through with all the proposed amendments, but on August 4th, the date adjourned to, the same kind of proceedings were continued until the remainder of the proposed amendments were disposed of, and at this juncture it was moved that the by-laws as thus amended "be and are hereby constituted the by-laws of the Republican City Central Committee." The chairman ruled the motion out of order, but on appeal was overruled. At this meeting there was an additional absentee, and objection was made to recording the vote as 14 to 11 on the question before the committee, and this objection being overruled by the chair an appeal was taken, and the chairman overruled, as usual. The chairman then directed the vote on the motion to be recorded as 15 yeas and 11 nays.

Motion was then made to declare all offices of the committee vacant. The motion went through the same routine as indicated by the above procedure, but

finally wound up by the chairman directing the vote to be recorded on the motion as 15 yeas and 11 nays.

The remainder of the proceedings are fairly stated in the brief of respondent thus:

"Mr. Riechmann requested Mr. Polito to act as secretary and moved that Mr. Jarrett be nominated as chairman. The chairman ruled the motion out of order, and on appeal the chair was overruled. Mr. Polito objected to the announcement of the vote as yeas 11, nays 14. The chairman overruled the objection and on appeal the chair was overruled, and the chairman instructed the secretary to announce the vote yeas 11, nays 15.

"Mr. Koeln moved to adjourn. Roll-call was asked. The chair refused; an appeal was asked; the chair put the motion to a *viva voce* vote and declared it carried, whereupon the chairman and ten members left the room.

"Mr. Galloway remained and took notes. Mr. Polito put the motion to adjourn and it was unanimously defeated by a vote of the 15 members who remained, Mr. Galloway not voting.

"Thereupon the following officers of the committee were elected by a vote of 15 yeas, no nays. W. E. S. Jarrett, chairman; Peter Anderson, vice-chairman; Nicholas A. Polito, secretary; Edmond Koeln, treasurer; Herman Baker, sergeant-at-arms.

"Mr. Galloway, although being present, not voting. The minutes of the meeting were then read and approved, and the committee adjourned until September 6, 1911."

This will give a fair idea of the condition of the records which we are asked to quash.

I. The statement of facts is taken from the return of the despondents, George W. Riechmann and others, and not from the return made by the respondent Galloway. There is a slight difference between

the two returns, which if of importance will be noted under the proper point.

At the threshold of the case we are met with the proposition in relators' brief that the committee had no right to remove the officers first elected at the time of the organization of the committee, and elect others in their place. This contention, if well taken, terminates the case, and we therefore discuss it first. In this regard the contention, boiled down, is that the officers elected are elected for the life of the committee (two years) and under the law the committee has no right to oust them. In his respect both the original Rule No. 1 and the amended Rule No. 1 are challenged as being violative of the statute. The question bespeaks a full consideration of our recent primary statutes in so far as they relate to party committees. Relators, under this point, cite us to the statute, section 5880, Revised Statutes 1909, and the cases of State ex rel. v. Miles, 210 Mo. 127, and State ex rel v. Lucas, 236 Mo. 18.

The Miles case, supra, does not benefit the relators. The question there at issue was as to the right of a city committee to oust one of its members, which member had been elected at a primary. The right of the committee to change its officers, during the life of the committee, was not a real issue in the case, but in discussing the statute then under consideration some observation was made as to the right of the committee in this regard. These observations are adverse to the contention of counsel in the case at bar.

In the Miles case, 210 Mo. l. c. 155, we said: "The general committee have the power to make changes of their chairman and secretary, and the provision is made to notify by certificate of such changes; but the statute is absolutely silent as to any notification to the election commissioners who have to deal with the committeemen representing the respective wards as to any information of any changes made in

the committee different to those to whom the certificates of election were issued by such commissioners. There can be but one valid reason for the silence of the provisions of the statute as to any change in the membership of the committee, and that is that the lawmaking power never intended, and it is not so recognized by the statute, that there should be any changes or any power to change the membership of such committee, but it is fully recognized that the membership of such committee shall be composed of such persons as were selected by the voters at the primary elections in the respective wards of such city, and that as to the names of the members of such, the election commissioners had full notice by reason of the fact that the certificates of their election emanated from such commissioners.''

The italics in the above are ours. The law then, as now, required the committee to give notice to the election commissioners of the elected officers of such committee, and it was in connection with the discussion of that law, that the remarks above quoted were made. Had the question here been an issue in the Miles case, the language supra would settle it against the relators. As it is, such language may be denominated *dicta,* but be that as it may, it outlines the views of the court upon the question.

The case of State ex rel. v. Lucas, supra, is not in point at all. The points in issue and determined in that case as thus tersely stated by VALLIANT, C. J.: ''The main points urged in relators' petition for a writ of prohibition are enumerated as six, but they may be condensed into three, viz.: First, that a court of equity has no jurisdiction to try title to a public office or to a position in the public service; second, it has no jurisdiction to order defendants to pay wages to the plaintiffs under penalty of imprisonment in case they do not do so; third, it has no jurisdiction to deprive relators of their power of suspension or

discipline or removal over the plaintiffs in said action 'in any manner or for any cause.' " These propositions were discussed, but neither the propositions nor the discussions thereof reach the question now before us.

Nor in our judgment does the statute contemplate a two-year undeterminable tenure by the officers of the committee. Section 5880, Revised Statutes 1909, says that the committee shall elect officers, on the Tuesday after the August primary. It fixes no term nor tenure. Going to subdivision 2 of section 6033, Revised Statutes 1909, we find this provision: "Every political committee shall, within ten days after its organization, file with the election commissioners a certificate specifying the names and addresses of its chairman and secretary. *If any change shall thereafter be made as to either of said officers, a like certificate shall be filed with said commissioners.*"

We have italicized the vital portion. To our mind this shows that the Legislature contemplated that the party committees, for reasons best known to themselves, might desire to change officers. It is urged that the changes here referred to have reference to such changes as might become necessary by death, resignation or such similar causes. We do not think so. Had the Legislature seen fit to give a two-year term to such officers, it would have fixed the term in the statute which provided for their appointment or selection. Had it intended to merely have changes made by death or resignation, it would have clearly so stated in the section last above quoted. The Legislature was not interested in keeping these particular officials in office, but was desirous of having the election commissioners know just who they were at all times, so that such commissioners might not in their official capacity act in conjunction with some one not duly authorized by the committee. To this end it provided that not only should the committee certify to the com-

missioners the officers selected upon the organization of the committee, but should likewise certify all subsequent changes made thereafter. The very statute contemplates that changes might be made, and if made could only be made by the committee. The law making power had no desire to strip party committees of all the power formerly possessed by them, but only of such powers as would best subserve the public interest in honest primaries and elections. Such political committee ought to have the right to change its officers. The political work of such committee might be stifled by unruly officials. The statute never contemplated that if the committee concluded that a mistake from a party standpoint had been made in the selection of a certain officer, such mistake could not be reached by the proper action of the committee. In other words, these laws were not intended to prevent party committees from doing active and efficient service for their respective parties, and to that end have officers thoroughly in harmony with the majority of such committees, but such laws were enacted solely for the purpose of securing, through the good offices of the State, absolute fairness and honesty in the selection of committeemen and in the action of the committee in so far as it came in contact with the State's election officials and machinery. This contention we, therefore, rule against the relators.

II. Nor did these relators and the other members of this particular committee understand the statutes differently when the committee was organized. At that time there was no friction between factions, and the committee adopted its Rule 1, by which it fixed a term or tenure, but further provided for the removal of officers. Of course, the construction given to laws by parties called upon to construe them is not binding upon the courts, but in many instances

such construction is said to have some persuasive pow-
ers with the court.

It is at least evident that the question now before
us was an afterthought. At the time of the adoption
of the rule the parties were clearly of the opinion (1)
that there was no fixed tenure or term under the stat-
ute, and (2) that there was power in the committee
to change its officials. Their first judgment was cor-
rect and their afterthought is wrong. If, as we have
concluded, these officials have no fixed tenure of of-
fice, and the committee has power to remove them, then
the contention that Rule 1 is in violation of law must
likewise fall. This applies to the rule both before
and after its amendment.

III. Learned counsel for respondents in very
apt words thus describes a further contention of the
relators:

"That the amendments to the rules adopted at
the meetings of August 2d and 4th were improperly
adopted because:

"A. They were adopted at a special and not at
a regular meeting of the committee.

"B. They were adopted contrary to the provi-
sions of the original rules.

"C. They were adopted by less than a majority
vote of the committee."

(a) Relating to the contention that the amend-
ments were adopted at a special and not at a regular
meeting, it must be said that the contention cannot
be sustained, either in law or fact. The meeting of
July 26th was what might be termed a special meeting
upon a call made by the chairman upon the written
request of the required number of members. No
amendments were made at this meeting. The statute
makes specific provision for but one meeting, and this
on the Tuesday after the August primary. The rule
then in force read: "The regular meetings of the

committee shall be held at headquarters pursuant to adjournment."

The meetings of August 2d and 4th at which the amendments were said to have been made were "pursuant to adjournments" and fell within the rule. This contention must therefore fall by the wayside. In addition, it should also be said that the statute permits the amendment of the rules of a committee upon reasonable notice being given, but neither the statute nor the previous rules required such act to be done at a regular meeting.

(b) Next, it is said that they were adopted contrary to the provisions of the previous rules, in this, that Rule 15 required three-fourths of the membership to amend the rules, and Rule 16 required a like vote. This is one of the real turning points in this case. If a given body adopts rules for its own conduct, and provides that such rules shall not be changed except as by Rule 15 stated, which required three-fourths of the membership, can a bare majority of the membership change the rules? In other words, granting that a bare majority can in the first instance make the rules, can the same power which made afterwards unmake? Stated differently, does a rule requiring a three-fourths vote to change the rules prevent a majority vote from changing that rule? Can a majority vote restrict its own power by such a rule, so that after such restriction the majority loses its potentiality? To my mind it is clear that the power to make carries with it the right and power to unmake. The same power which can make rules in the first instance can directly attack and unmake or repeal such rules. The power which in the first instance can do a thing retains its potentiality and can undo the same thing. Rules are made solely for the government of the body. So long as those rules remain in force, no act of the body is valid if done in violation of the rule, but that is not the

239 Sup.—7

question we are now discussing in this case.   Our
question is, if under the laws of the State, a mere ma-
jority of a political committee had the power to make
rules, can a mere majority repeal or change their
rules?   This question we think, must, with certain
qualifications to be stated, be answered in the affir-
mative.   The qualification above referred to is this:
Suppose by a bare majority rules are adopted and
among them is a rule saying that no change shall be
made therein, except upon a three-fourths vote of the
members, then in such case before the majority could
proceed to enact new rules, it must first directly at-
tack this rule which limited the power of the bare
majority.   The majority undertook to place there the
limitation, and by a direct attack upon such rule, can
remove the limitation, and when this limitation is re-
moved, then the majority can and should govern in
all matters.

The laws of this State place no limitations upon
the power of the majority to make or repeal rules.   In
such cases the general rule of law is well stated in 29
Cyclopedia of Law and Procedure, p. 1689, thus: "The
general rule is that, in the absence of express provi-
sion to the contrary, a proposition is carried in a de-
liberative body by a majority of the legal votes cast.
However, where the statute requires a majority or
two-thirds of all the members, a vote of less than that
number, although a majority of those present and vot-
ing, is not sufficient.   So too where a statute requires
all the members of a body to be present when a vote
is to be taken on a proposition, a majority vote of
all the members of the body is necessary."

The further proposition that a bare majority can
repeal a rule which it has adopted, and by which there
has been imposed limitations upon the power of a
bare majority is equally well settled by the sound case
law of the land.

State ex rel. v. Riechmann.

The matter in issue is discussed, and learnedly so, in the early case of Smith v. Nelson, 18 Vt. 511. The syllabus in a few words states the rule in this language: "Although these voluntary associations frequently make constitutions and pass by-laws, which they declare are not to be altered, except in a certain manner, yet their constitution and laws may at any time be altered, or abrogated, by the same power which created them; and the vote of any subsequent meeting, abrogating or altering such constitution, though passed only by a majority, has as much efficacy, as a previous vote establishing them."

To a like effect is the language of Chief Justice GIBSON in Commonwealth ex rel. v. Mayor of Lancaster, 5 Watts (Pa.) 1. c. 155. GIBSON, C. J., says: "Had the form been prescribed in the act of incorporation, the affirmative might-have been assumed without risk of contradiction; but a power to repeal is an incident of the power to enact. *Eodem modo quo oritur, eodem modo dissolvitur;* and hence we see that a body competent to make a by-law, is also competent to repeal it. [Wilcock, part 1, tit. 237.] And this holds though there be a clause expressly in derogation of the right to repeal. *Non impedit clausula derogatoria, quo minus ab eadem potestate res dissolvitur, a quibus constituuntur;* according to which, all attempts to restrain the repealing power by anticipating are vain. It would, therefore, be immaterial had the rule been declared irrevocable by less than two-thirds."

ALLEN, J., for the Supreme Court of New Hampshire, in Richardson v. Society, 58 N. H. 1. c. 188, thus discusses the question: "Complaint is made that the amendment of by-law thirteen, requiring a two-thirds vote, for the admission of new members, was not properly and legally enacted, because its passage was not obtained by a vote of two-thirds of those present, according to by-law twelve requiring a vote of two-thirds of the members present to alter or amend the

by-laws of the society. . . . But the question of
the adoption of the amendment by a two-thirds vote
of the members present is immaterial. By-law twelve
was no part of the charter or constitution of the so-
ciety, and not a law for the guidance of its officers
and agents. It was an enactment made by one meet-
ing of the society to govern the proceedings of future
meetings, and was inoperative beyond the pleasure
of the society acting by a majority vote at any regular
meeting. The power of the society, derived from its
charter and the laws under which it was organized to
enact by-laws is continuous, residing in all regular
meetings of the society so long as it exists. Any
meeting could, by a majority vote, modify or repeal
the law of a previous meeting, and no meeting could
bind a subsequent one by irrepealable acts or rules of
procedure. The power to enact is a power to repeal;
and a by-law, requiring a two-thirds vote of members
present to alter or amend the laws of the society, may
itself be altered, amended or repealed by the same
power which enacted it. [Angell & Ames on Corp.
459; Com. v. Mayor of Lancaster, 5 Watts, 152, 155;
Wardens of Christ Church v. Pope, 8 Gray, 140, 142.]
The society, by a majority vote, might repeal or amend
by-law twelve.''

In Boisot on By-Laws (2 Ed.), sec. 18, the case
law is thus summarized: ''What has been already
said in regard to the amendment of by-laws is also
applicable to the subject of their repeal. The power
that can adopt by-laws may repeal them. Any meet-
ing of persons authorized to enact by-laws can repeal
such by-laws by a majority vote, and even a by-law
requiring a two-thirds vote of the members present
to alter or amend the by-laws of a corporation may
itself be altered, amended or repealed by a majority
vote of the same power that enacted it.''

The St. Louis Court of Appeals has recognized
the rule stated in the above authorities in the case

of State ex rel. v. Alt, 26 Mo. App. 673. In that case THOMPSON, J., said: "Much of the argument presented on behalf of the relator is to the effect that the removal of the relator, and the election of the respondent, as the Speaker of the House of Delegates, was had in violation of the rules of that body. We do not see upon what principle this, if true, invalidates his election. Those rules have not, in any proper sense, the force of a public law. They are merely in the nature of by-laws, prescribed by a deliberative body for the orderly and convenient conduct of its own proceedings. The power that made them can unmake them, or disregard them."

We are, therefore, of opinion that a majority being authorized in the first instance to pass a rule cannot only pass it but can at any time thereafter annul the same rule, even though the rule to be repealed or annulled is one which provides that no rule can be repealed or amended without a vote greater than a majority.

The statutes of this State authorizes the city committee to pass rules for its own government, but does not undertake to say by what number of votes such rules should be passed. In such case the general rule of law is that a bare majority will suffice. That was the common-law rule. And as stated above, if a majority is authorized to pass a rule, the same power can amend or abrogate the rule. This contention is therefore ruled against the relators.

But it is urged that the amendment of Rule 3 was made prior to the amendment of Rule 15, and that under Rule 15 then in force, it required more than a bare majority to amend Rule 3. Even if we grant this, yet when we examine the record before us we find that after Rule 15 had been amended, then Mr. Polito moved that all the amended rules be adopted as the rules of the committee, and this would

clearly obviate this contention, so that this question we likewise rule against the relators.

(c) Lastly it is urged under this point that the amendments were not passed by even a majority of the members. The law creating the city committee contemplates that it may adopt new rules for its own government, but, as said above, does not say what proportion of the committee shall be required to pass such rules. Under that state of facts it is clear under the general rule of law that a majority can act. Under the law such a majority constituted a quorum for the transaction of business.

The rule is further stated in 29 Cyc., p. 1688, thus: ''Where a quorum is not fixed by the Constitution or statute creating a deliberative body, consisting of a definite number, the general rule is that a quorum is a majority of all the members of the body. In case, however, the number of members of the body is indefinite, the majority of those members present at a regular meeting constitutes a quorum for the transaction of business.''

In Barnert v. Paterson, 48 N. J. L. l. c. 399, it is said: ''The whole membership of the board consisted of sixteen. The charter provides that a majority of the whole number of members shall constitute a quorum for the transaction of business (section 22). It is denied that this passed the order of payment, on the ground that the board of aldermen had adopted amongst its rules one which provides that no resolution, by-law or ordinance shall be passed without a concurring vote of at least nine members, and if they involve the expenditure of money, they shall require the votes of two-thirds of the whole members of the board. There are various provisions in the charter declaring the number of votes required in specified cases, but there is no part of the charter which provides for the number requisite to order payment of a claim passed upon by the finance committee. The

true rule in such a case I think is correctly stated in the brief of the counsel of plaintiff. When the charter of a municipal corporation or a general law of the State does not provide to the contrary, a majority of the board of aldermen constitute a quorum, and a vote of a majority of those present, there being a quorum, is all that is required for the adoption or passage of a motion or the doing of any other act the board has power to do. [1 Dill. Mun. Corp., secs. 278, 283; Walls v. Rahway River Co., 4 C. E. Green, 402.]''

The Barnert case, supra, is cited with approval in the later case of Outwater v. Carlstadt, 66 N. J. L. l. c. 513.

To a like effect is the Maryland court in the case of Zeiler v. Railroad, 84 Md. l. c. 323, where it is said: ''To construe the words 'two-thirds of the members of the branch,' as used in the ninth rule, to mean two-thirds of all the members, would be to fix a meaning upon them that would deprive the majority of their legal power to act. It would amount to declaring that a majority constituting the lawful body, intended, by a rule of procedure, to take away from itself, under certain circumstances, the power it rightfully has to do the work it has assembled to do. We think, therefore, it would be anomalous to hold that, while a majority is competent to do business, a rule, made under a power to settle the 'mode and manner' of conducting the business, should be construed in such a manner as to take away from it the power to do business at all, under certain circumstances. 'Two-thirds of the members of the branch,' we are of opinion, means two-thirds of the members voting, not being less than a majority; and not two-thirds of all the members. This view is fully sustained by authority. In the case of the State v. McBride, 4 Mo. 308, the question was upon the adoption of an amendment of the Constitution. 'Two-thirds of each house' was the vote neces-

sary to ratify it. The question to be solved was, what was the meaning of the word 'house' as used in the Constitution; did it mean all the members elected, or did it mean any number sufficient to constitute a quorum? The court held that the most 'common meaning of the word being, the number of members sufficient to constitute a quorum to do business,' a vote of two-thirds of those voting, being a quorum, was sufficient.''

The rule seems to be that, unless there be some specific law to the contrary, a majority of a given body has the right to transact all business which the entire body is authorized to do. And not only so but that a majority vote of those present and voting (there being a majority participating) can do all the things which could be done by the entire body. This was the common-law rule, and is only changed by some express provision. The theory is that the majority is the body itself for the transaction of business.

Upon the latter proposition announced just above, 29 Cyc., p. 1690, says: ''Where a quorum is present a proposition is carried by a majority of the votes cast, although some of the members present refuse to vote.''

In United States v. Ballin, 144 U. S. 1. c. 6, Mr. Justice BREWER, for that court, said: ''As appears from the journal, at the time this bill passed the house there was present a majority, a quorum, and the house was authorized to transact any and all business. It was in a condition to act on the bill if it desired. The other branch of the question is, whether, a quorum being present, the bill received a sufficient number of votes; and here the general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum is the act of the body. This has been the rule for all time, except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations. As, for instance, in those States where the Constitution provides that a majority of all the mem-

bers elected to either house shall be necessary for the passage of any bill. No such limitation is found in the Federal Constitution, and therefore the general law of such bodies obtains.''

This opinion reviews the case law upon the subject. It covers the case at bar. The law creating this committee placed no limitations upon its manner of doing the business entrusted to its care. By this we mean the law did not say how many members elect would have to vote for a rule or any other proposition in order to carry it. Upon these matters it is governed by the general rule of law.

In State ex rel. v. Vanosdal, 131 Ind. 1. c. 391, that court says: ''The question as to whether or not the appellee, Vanosdal, was elected, having received a majority of the votes cast, there being a quorum present, has been decided by this court in Rushville Gas Co. v. City of Rushville, 121 Ind. 206, and State ex rel. v. Dillon, 125 Ind. 65. Under the rule as laid down by these decisions, it must be held that Vanosdal was duly elected. The principle settled by these decisions is to the effect that the presence of the other trustees suffices to constitute the elective body, and if any of them neglect to vote it is their own fault, and the assembly being sufficient to constitute an elective body, the person receiving a majority of the votes cast is duly elected. In this case four of the trustees would constitute a quorum, but the full number, six, were present, and three cast their votes for the appellee; the other three refused to vote, and the chairman declared him elected. Under the authorities we have cited he was duly elected, unless the fact that the hour of midnight had arrived terminated all authority of the trustees to act in the matter, and rendered any election after that hour void.''

In this case there were but six members of the body. It required four for a majority. Only three voted, but the others were present. The holding in

effect declares that the three votes cast was a majority of a necessary quorum and therefore vitalized the act.

In Attorney-General v. Shepard, 62 N. H. 383, the syllabus which concisely states the holding of the court, thus runs: "In the absence of express regulation to the contrary, when a quorum is present at a meeting of a board of aldermen, and their journal properly shows the presence of a quorum, a proposition is carried by a majority of the votes cast, and it is not necessary that a quorum should vote."

In 23 Am. & Eng. Ency. Law (2 Ed.), p. 589, a quorum is thus defined: "A quorum is the number of members of a deliberative or judicial body whose presence is necessary for the transaction of business." On the same page it is said: "But by the common law a majority of a select and definite body constitutes a quorum."

This statement of the common-law rule is thoroughly supported by the numerous cases cited, including both American and English decisions.

Going now to the case at bar, we must hold that inasmuch as the statutes of this State have not prescribed what number shall constitute a quorum for the transaction of business by this committee, the common law fixes a quorum of such committee at a majority of its members. Such quorum has the full power of the whole committee, and for the purposes of transacting business is in law the committee itself, and if in the transaction of any business a majority of that quorum votes for a measure such measure is as valid and binding as if adopted by the entire vote of the committee.

This rule is well put in 23 Am. & Eng. Ency. Law (2 Ed.), p. 591, thus: "A quorum is, for all legal purposes, as much the body to which it appertains as if every member were present, and when a quorum has met an act of the majority of such quorum is an act of the body itself."

Applying these principles of law to the case at bar it becomes immaterial as to whether Troll was a legal voter in the committee, so far as the adoption of the new rule is concerned. Both returns show that there were present at the meetings of August 2d and 4th, 26 and 25 members, respectively, besides Troll. Both returns show that the vote at these two meetings respectively stood at least 14 to 12 and 14 to 11, and this without the vote of Troll and the proxy of Mr. Dyer. Under these facts there was more than a quorum present, and a majority of the number present voted for the new rules, which in law adopted them, even without the contested vote of Mr. Troll. The contention therefore that the new rules were not legally adopted cannot be sustained.

IV. There remains but the one question, and that is whether or not on the record before us Kiel, as chairman, and Galloway, as secretary, were properly removed under the new rule adopted on August 2, 1911. This rule says: ''They shall hold office during the continuance of the committee; provided, however, that any or all of said officers may be removed by not less than fifteen votes, elected members of the 28 members of the committee.''

It will be observed that this rule required a vote of fifteen elected members to remove the officers named. The action of the committee upon this question must measure up to this rule, because the rule was then in force. The two returns differ upon this vital question in a slight degree. The Galloway return reads:

''Moved by Mr. Polito that all offices of the Republican City Central Committee be declared vacant.

''Seconded by Mr. Jarrett.

''Chairman ruled above motion out of order for the same reason as previously given in connection with two motions heretofore made by Mr. Polito concern-

ing rules and by-laws of this committee, and that the committee had no power to remove officers, and that the motion was illegal.

"Mr. Polito appealed from the decision of the chair.

"On roll-call to sustain chair, vote was as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14. Chair not sustained.

"Mr. Polito objected to omission of 9th Ward in roll-call. Chairman overruled objection. Roll-call as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14. Chairman not sustained.

"On the original motion made by Mr. Polito to declare all offices vacant the result was as follows:

"Yeas: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Nays: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Yeas, 14; Nays, 11.

"Mr. Polito objected to omission of 9th Ward in roll-call. Chairman overruled objection. Roll-call as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14. Chairman not sustained.

"The chairman declared the motion lost. Mr. Polito appealed from the ruling of the chair. Roll-call to sustain the chair resulted as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14.

"Mr. Polito objected to the omission of the 9th Ward from the roll-call. Chairman overruled objection.

"Mr. Polito appealed from the decision of the chair.

"Roll-call as follows to sustain the chair:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14."

The other return is practically the same except wherever the chairman was overruled as to the vote of the 9th Ward, this return says: "Mr. Kiel announced 'chairman not sustained,' and instructed the secretary to announce the vote 15 to 11." Words of this character appear throughout the return made by Polito and others, whenever the chairman's action as to the 9th Ward was an issue, and it was an issue in all the votes.

Throughout it appears that the chairman was refusing Troll the right to vote, and from the beginning to the end the chairman was overruled by a majority of those present, there being at all times a quorum. Upon the question of Troll's right to vote, a majority vote of those present was all the law required. Upon the motion as to whether or not the chairman should be sustained, a majority vote of those present was all the law demanded. So that we conclude (1) that under the action of the committee the Troll vote should have been counted throughout, and (2) that the facts sufficiently appear even from Galloway's return to show in law that it was counted. By this we mean that when objection was made to the failure of the secretary to include this vote in his announcement, and the chairman sustained the secretary, but upon appeal to the body the chairman's ruling was not sustained, it amounted to just what the return of Polito and others say. It was in fact and in law a direction to record the vote as 15 to 11 upon the question of removing these officers. The committee had refused to recognize a vacancy in the 9th ward, and Troll was there exercising or trying to exercise the right to rep-

resent that ward. His claims were recognized by the committee, or more precisely stated, by such portion of the committee as in law bound the committee. Even if it be conceded that the chairman in the first place had the right to say that Troll's vote should not be counted, it must be further conceded that the action of the chairman could be overruled upon an appeal to the body itself, and this was done in every instance. In State ex rel. v. Miles, supra, a majority of the court held that the committee itself could not remove an elected committeeman, and if so, it certainly follows that the chairman, a mere servant of the committee, has no greater rights.

In our judgment the record shows that these offi- cers were legally removed. The rule required no no- tice. Under the rule as amended and before, these officers were removable at the pleasure of the commit- tee, by a stated number of votes being polled for that purpose. The character of this kind of a tenure is well discussed in State ex rel. v. Alt, supra.

The Galloway return as to the election of the new chairman says:

"Mr. Riechmann nominated Mr. W. E. S. Jarrett for chairman.

"Nomination seconded by Mr. Polito.

"Nomination ruled out of order by Chairman Kiel.

"Mr. Polito appealed from the decision of the chair.

"Roll-call on sustaining the chair the vote was as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14. Chair not sustained.

"Mr. Polito objected to omission of 9th Ward in roll-call. Chairman overruled objection. Roll- call as follows:

"Yeas: Wards 1-2-6-12-13-14-15-17-18-22-24.

"Nays: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 11; Nays, 14.    Chairman was not sustained.

"Mr. Riechmann moved the previous question and Mr. Jarrett was elected chairman by the following vote.

"Yeas: Wards 3-4-5-7-8-10-11-19-20-23-25-26-27-28.

"Yeas, 14.    All others refused to vote."

Whether this return recites the exact facts or not it is sufficient to show the election of the new chairman provided there was a vacancy, and there was a vacancy, as we have above indicated. The rule requiring fifteen votes from elected members only applied to the removal of officers. It does not apply to the election of officers. As to the election of officers the general rule applies. There was a quorum of the committee present according to both returns, and according to both returns a majority of that quorum voted for Jarrett as chairman. It follows that the election of Jarrett was legal. What is said as to this office applies to all others. It is suggested in the brief that Mr. Troll of the 9th Ward had been selected as city jailer and had moved to the jail in the 6th Ward to perform his duties there, but with no intent to change his residence. This would make him in law a resident of the 9th Ward, but this is a bare statement in the brief, and the case is not at all dependent upon a solution of this question here.

It follows from what has been said that we sustain the records of the city committee in so far as they are invoked in this controversy. That is to say, we hold (1) that the rules were properly amended as shown by the records, (2) that the offices of the committee were legally and properly declared vacant, as shown by such records, and (3) that the new officers of such committee were legally elected as shown by such records.

We, therefore, sustain the records of the city committee as aforesaid, and refuse to quash them as requested by relators. Costs of this action should be and are adjudged against relators.

*Lamm, Woodson,* and *Ferriss, JJ.,* concur in these views; *Kennish, J.,* files separate opinion, holding that our writ of *certiorari* was improvidently issued, in which *Valliant, C. J.,* and *Brown, J.,* concur; and *Valliant, C. J.,* is also of the opinion that this court has no jurisdiction of this cause for the reasons expressed by him in State ex rel. v. Miles, supra.

## SEPARATE CONCURRING OPINION.

KENNISH, J.—I concur in the foregoing opinion in so far as it holds that relators are not entitled to relief, but my concurrence is based upon the ground that the writ of *certiorari* was improvidently issued and therefore should be quashed, and not upon the ground, as stated in the opinion, that the court sustains "the records of the city committee." Briefly, my reasons are the following:

The decisions of this court, in full accord with the general law on the subject, uniformly hold that the writ of *certiorari* will lie only against judicial or quasi-judicial bodies, and that it will bring before the court for review only such records as are judicial in their character. [Matter of Saline County Subscription, 45 Mo. 52; State ex rel. v. Shelton, 154 Mo. 1. c. 689; State ex rel. v. Harrison, 141 Mo. 12; State ex rel. v. Reynolds, 190 Mo. 1. c. 588; State ex rel. v. Shocklee, 237 Mo. 460; 6 Cyc. 750; 4 Ency. Pl. and Pr. 11.]

The foregoing rule, which is a canon of common law procedure, is not changed by the provisions of section 6530, Revised Statutes 1909, by which act it was sought to apply the remedies of mandamus and *certiorari* to the review of certain actions and pro-

ceedings of political committees, for, as shown by the opinion of VALLIANT, J., in the case of State ex rel. v. Reynolds, supra, that section was taken from the New York law, a State in which the judicial system authorizes those remedies in matters entirely foreign to the use of such writs under our system. Discussing that section of the statutes, and its effect upon the remedies by mandamus and *certiorari,* this court then said: "It is in the first sentence of that section that the attempt is made to subject certain acts of the election officers to review, 'by the appropriate remedy of mandamus or *certiorari.*' The act recognizes that the remedy afforded must be appropriate to the one or the other of the writs named; it authorizes the use of either of those writs only when it is appropriate, and it does not undertake to amend the law in reference to either of those writs by giving it a function it did not before possess. Therefore, when the nature of the case is such that the common law writ of mandamus or *certiorari* is appropriate, the statute says it may be used, but the statute goes no further."

According to the doctrine of the Reynolds case, the remedy by *certiorari* in this State is still governed by the general rule that only proceedings judicial in character will be reviewed by this writ.

The opinion in this case correctly holds that the selection of officers of the county or city central committee is a matter entirely within the power and control of the committee, and that their official tenure is dependent solely upon the will and pleasure of that body. Upon that assumption, if the committee sees fit to change its chairman, or secretary or treasurer, can it be said that in so doing it is engaged in the exercise of a judicial function, warranting resort to the extraordinary writ of *certiorari* of this court? The mere statement of that question suggests the correct and only answer. If this court has jurisdiction by

*certiorari* to decide that the record of a county or city political committee, in ousting one officer and in selecting another, is judicial and regular, then it must follow that if the record was not regular and the title of the incumbent was not valid, this court would have jurisdiction, by a proceeding in *quo warranto,* to oust him from the office. Indeed, it is apparent that the very purpose of this proceeding is to determine the right to the offices of chairman, secretary and treasurer of the city committee. Relators have no standing or interest to maintain *certiorari* other than their claim to such offices, and if successful in this court the only effect would be to invalidate respondents' titles and reinstate relators. And here the doctrine of the opinion of the court runs counter to the established law of *certiorari* that, "unless by statute, *certiorari* will not lie to try title to office or where the determination of the right to office is the obvious and only object of the writ." [See 6 Cyc. 758.] The same principle of law is stated in 2 Spelling on Extraordinary Remedies (2 Ed.), sec. 1900, as follows: "*Not Granted in Lieu of Quo Warranto.* The law affords an adequate and appropriate remedy for the trial of title to office by *quo warranto,* and *certiorari* is not the proper remedy."

In the case of State ex rel. v. Miles, 210 Mo. 127, the right of a political committee of the city of St. Louis to oust a member from office was involved. This court then held that the action of the committee in ousting a member was invalid, for the reason that the member was elected to his position by the qualified voters and thereby acquired a quasi-official status, of which he could not be deprived by the committee. The primary law under which that case was determined was identically the same as the law at the time the case in hand arose, and yet, in a dissenting opinion by VALLIANT, J., in which GRAVES, J., concurred, it was held, as concisely stated in the syllabi, that:

"Courts have no jurisdiction to decide causes in which neither life, liberty nor property is involved. The right to be a member of a mere voluntary committee, whether organized for social, political or religious purposes, is outside the realm of the judiciary.

"When the government undertakes by its courts to regulate such matters, it goes beyond the scope of legitimate free government.

"A political committee is a voluntary organization, governing itself by its own rules and answerable only in the forum of the public opinion of the fellow-citizens of their party, and until it or its members impinge on the property rights of an individual or his rights as a citizen, the courts have nothing to do with them. A difficulty over the right of a citizen to be a member of a city committee should be taken to the State committee of the party for settlement."

In the majority opinion in that case it was held that as the member was elected by the qualified voters, he was answerable to them and could not be ousted by the arbitrary action of his fellow-members of the committee. But under the facts of the case at bar the action of the committee did not in any manner affect the title of any member to the office to which he was elected by the voters. It had to do only with officers of the committee, whose selection depended entirely upon the voluntary action of the members thereof, and therefore should be as free from interference or review by the courts as before the statutory law took any cognizance of political committees. The facts of this case, therefore, do not bring it within the doctrine of the controlling opinion in the Miles case, but bring it within the principle of law stated in the minority opinion, that courts will not interfere in the internal affairs of voluntary associations.

Conceding that the courts should protect the official title of a member elected by the voters, it by no means follows, as held in the opinion herein, that they

should interfere in the organization and internal affairs of the committee. If a controversy arises in the committee, as to who is its rightful treasurer or secretary or chairman, and it cannot be settled within the body itself, then it becomes a proper matter to take before the superior body of the same political party, as has always been done in the past, and as is the recognized law and practice in the case of churches, clubs and all such bodies acting as voluntary organizations, where property rights are not involved. The writ of *certiorari* of this court is an extraordinary writ, to be invoked only in case of an alleged wrongful exercise of judicial power, and if it is to be called into requisition to settle political controversies and differences in county or city committees, and to construe their rules and by-laws, then it will be put to a use hitherto unknown in the decisions of this State. I think the writ was improvidently issued and should be quashed. *Valliant, C. J.,* and *Brown, J.,* concur in this opinion.