675 F.2d 1282
 219 U.S.App.D.C. 57
 Howard M. METZENBAUM, et al., Complainants,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Foothills Pipe Lines (Yukon) Ltd., Alaskan Northwest Natural
Gas Transportation Company, Philadelphia Council of
Neighborhood Organizations, Bronson C. LaFollette, Attorney
General of the State of Wisconsin, Intervenors.
 No. 82-1097.
 United States Court of Appeals, District of Columbia Circuit.
 Argued April 8, 1982.
Decided April 20, 1982.
 
 On Complaint Under the Alaskan Natural Gas Transportation Act, 15 U.S.C. 719h(c)(1).
 Herman Schwartz, Washington, D. C., with whom Edward L. Petrini, Lansing, Mich., was on the brief, for complainants. R. Philip Brown, Lansing, Mich., also entered an appearance for complainant Frank J. Kelley, Atty. Gen., State of Michigan, Detroit, Mich., Margaret Ann Samuels, Columbus, Ohio, also entered an appearance for complainant, Office of Consumers' Counsel, State of Ohio.
 Charles A. Moore, Houston, Tex., Gen. Counsel, Federal Energy Regulatory Commission, of the bar of the Supreme Court of Texas pro hac vice by special leave of the Court, with whom Jerome M. Feit, Sol., and Andrea Wolfman, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.
 
 
 1
 William J. Grealis, with whom Rush Moody, Jr., Ronald M. Johnson, John F. Markus and Seth R. Molay, Washington, D. C., were on the brief, for intervenor, Alaskan Northwest Natural Gas Transp. Co.
 
 
 2
 George W. McHenry, Jr. and John H. Burnes, Jr., Washington, D. C., were on the brief for intervenor, Foothills Pipe Lines (Yukon) Ltd.
 
 
 3
 Edward L. Petrini, Lansing, Mich., also entered an appearance for intervenor, Philadelphia Council of Neighborhood Organizations.
 
 
 4
 Bronson C. LaFollette, Atty. Gen., Madison, Wis., pro se.
 
 
 5
 Before ROBB, WALD and GINSBURG, Circuit Judges.
 
 
 6
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 7
 In this action, a number of United States Senators and Representatives, States, state officials and consumer advocates[1] challenge the validity of Pub.L.No.97-93, 95 Stat. 1204, which waived certain provisions of federal law, notably certain sections of the Alaskan Natural Gas Transportation Act ("ANGTA"), 15 U.S.C. §§ 719-719o, that would otherwise have governed the construction and operation of the Alaskan natural gas pipeline. Also at issue is a Federal Energy Regulatory Commission ("FERC") order issued in conformity with the waivers. Complainants seek declaratory and injunctive relief on the grounds that Pub.L.No.97-93 was enacted in violation of the procedures mandated by ANGTA, that it unconstitutionally deprives natural gas consumers of the right to just and reasonable rates, and further that the FERC order issued pursuant to the waiver was improperly promulgated without notice and comment. We find that the first challenge to Pub.L.No.97-93 is not suitable for judicial resolution. As to the second challenge, we find that complainants have not made out a claim that the statute is facially invalid and that issues they raise as to possible applications of the statute are not ripe for decision. Finally, we find that the FERC order was appropriately issued without notice and comment as a nondiscretionary ministerial action.
 
 I. BACKGROUND
 
 8
 ANGTA established the framework for a federal role in the development of a transportation system for delivery of natural gas from Prudhoe Bay, Alaska, through Canada, to the contiguous states and for federal regulation of rates to be charged for Alaskan natural gas transported through the system. ANGTA includes, inter alia, procedures for Congressional incorporation into the Act of Presidential determinations regarding the construction and operation of such a system, 15 U.S.C. §§ 719e, 719f. Pursuant to these provisions, President Carter submitted a Decision and Report to Congress ("Decision") which Congress enacted into law in late 1977, Pub.L.No.95-158, 91 Stat. 1268. Over the next two years, FERC issued a series of orders implementing the Decision. Among these was an order authorizing Alcan Pipeline Company to construct and operate the Alaskan segment of the pipeline, Order Vacating Prior Proceedings and Issuing Conditional Certificates of Public Convenience and Necessity, FERC Docket Nos. CP78-123, CP78-124, CP78-125 (Dec. 16, 1977), Joint Appendix ("J.A.") at 1, and several orders interpreting terms of the Decision.
 
 
 9
 ANGTA also established a mechanism for Congress to agree to waive otherwise applicable regulatory requirements if the President so recommended in order to expedite construction and operation of the system. 15 U.S.C. § 719f(g). In late 1981, proposing to "clear away governmental obstacles to proceeding with private financing of this important project," President Reagan initiated the process to set aside some portions of President Carter's Decision, the Natural Gas Act, 15 U.S.C. §§ 717-717w, and the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201-6422. 127 Cong.Rec. S11514, H7351 (daily ed. Oct. 15, 1981) (Message from the President accompanying Findings and Proposed Waiver of Law). President Reagan submitted to each house of Congress a proposal to waive President Carter's Decision to the extent that it prohibited participation in ownership of the pipeline by Alaskan natural gas producers,[2] barred inclusion in the pipeline rate base of the capital costs of the conditioning plant that prepares gas for transmission through the system,[3] and disallowed pre-billing, i.e., charging consumers for the cost of the pipeline "prior to completion and commissioning of operation of the system." Decision at 38.[4] President Reagan's proposal further sought to waive the provisions of the Natural Gas Act that might require formal evidentiary hearings on applications for authorization of pipeline construction or operation, 15 U.S.C. § 717f(c)(1)(B), and to withdraw from FERC its authority under the Natural Gas Act to revise rates "in such a manner as to reduce project revenues below the level necessary to service project debt, or the shipper tariff in such a manner as to reduce their ability to pay the project tariff." H.R.Rep.No.350, 97th Cong., 1st Sess. 20 (1981).[5]
 
 
 10
 On October 19, 1981, joint resolutions to approve the waivers were introduced in each house. Except for the formal headings, the resolutions were identical:
 
 
 11
 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the House of Representatives and Senate approve the waiver of the provision of law (Public Law 95-158, Public Law numbered 688, Seventy-fifth Congress, second session, and Public Law 94-163) as proposed by the President, submitted to the Congress on October 15, 1981.
 
 
 12
 H.R.J.Res. 341, 97th Cong., 1st Sess., reprinted at H.R.Rep.No.350, 97th Cong., 1st Sess. 2 (1981); S.J.Res. 115, 97th Cong., 1st Sess., reprinted at S.Rep.No.272, 97th Cong., 1st Sess. 1 (1981). The Senate version, S.J.Res. 115, was passed a month later by a vote of 75 to 19, 127 Cong.Rec. S13711 (daily ed. Nov. 19, 1981), and the House version, H.R.J.Res. 341, was passed on December 9, 1981 by a vote of 233 to 173. 127 Cong.Rec. H8964 (daily ed. Dec. 9, 1981). Immediately after passage of H.R.J.Res. 341, following "normal procedure," Representative Udall asked for unanimous consent to consider the identical Senate resolution "so there (would) be action by both bodies on the same matter," but an opponent of the waivers objected. Id. at H8965. The following day, Representative Long submitted to the House a rule to allow consideration of the Senate resolution. H.R.Res. 296, 97th Cong., 1st Sess., 127 Cong.Rec. H9082 (daily ed. Dec. 10, 1981). Representative Long noted that ANGTA outlines certain parliamentary procedures and further provides that either house may alter those rules in the same manner as any other parliamentary rules. Id. He concluded, therefore, that "a special order providing for the consideration of the joint resolution which is in itself a temporary amendment to the rules of the House is perfectly in order." Id. at H9082-83. The rule change was agreed to, id. at H9090, and the Senate resolution was considered and passed by a vote of 230 to 188. Id. at H9090-101. The President signed the Senate resolution into law on December 15, 1981, and it became Pub.L.No.97-93.
 
 
 13
 On January 4, 1982, FERC issued an order amending the initial authorization for construction and operation of the pipeline to include the conditioning plant within the approved system. Order Amending Conditional Certificate, FERC Docket Nos. CP78-123 et al. (Jan. 4, 1982), J.A. at 538. FERC regarded the amendment as "a ministerial action" mandated by the waiver of law to be taken "without any exercise of administrative judgment or discretion," and concluded that "opportunity for notice, intervention and comment would serve no useful function." Id. at 3, J.A. at 540. On January 28, this cause was brought in accordance with the requirement that ANGTA claims be heard exclusively and expeditiously by this court acting as a Special Court. 15 U.S.C. § 719h.
 
 II. ANALYSIS
 
 14
 A. Complainants first argue that Pub.L.No.97-93 is invalid because it was passed in violation of ANGTA parliamentary rules, 15 U.S.C. § 719f(d)(5)(B), which bar consideration by either house of Congress of a resolution approving proposed waivers within 60 days of considering "any other resolution respecting the same Presidential (recommendation)." This provision was enacted by Congress
 
 
 15
 as an exercise of the rulemaking power of each House of Congress, respectively, and as such it is deemed a part of the rules of each House ... with full recognition of the constitutional right of either House to change the rules (so far as those rules relate to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of such House.
 
 
 16
 15 U.S.C. § 719f(d)(1). Thus, complainants ask us to decide whether or not the rules of the House of Representatives permitted consideration of the Senate resolution so quickly after passage of the House resolution. To resolve this issue would require us not only to construe the rules of the House of Representatives but additionally to impose upon the House our interpretation of its rules, i.e., whether the Senate resolution was in fact an "other resolution" within the meaning of the ANGTA rules and further whether the rule actually adopted by the House to allow consideration of the Senate resolution was effective under or took precedence over ANGTA so as to permit a change in the procedures it prescribes. There is no question here of whether Constitutional procedural requirements of a lawful enactment were observed, cf. Consumer Energy Council of America v. FERC, 673 F.2d 425 at 453, (D.C.Cir.1982), but only of whether the House observed the rules it had established for its own deliberations. We conclude that this issue, like most "questions involving the processes by which statutes ... are adopted," is "(p)olitical in nature," C. Wright, Law of Federal Courts 53 (3d ed. 1976), and is therefore nonjusticiable.
 
 
 17
 This court has recently restated that the political question doctrine "is part and parcel of separation-of-powers doctrine," Murray v. Buchanan, 674 F.2d 14 at 20 (D.C.Cir.1982) (quoting The Supreme Court, 1980 Term, 95 Harv.L.Rev. 91, 198-99 (1981)), and is concerned with whether an issue is "appropriate for judicial determination." Id. at 20. The "prime ingredient of the political question doctrine," id. at 20, is the inquiry whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). We find such a commitment in Art. I, § 5, cl. 2 of the Constitution which provides that "Each House may determine the Rules of its Proceedings ...." Although judicial intervention may be appropriate where rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures, see Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); Christoffel v. United States, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949); United States v. Smith, 286 U.S. 6, 33, 52 S.Ct. 475, 477, 76 L.Ed. 954 (1932), no such concern is raised here. Otherwise, there is ordinarily "no warrant for the judiciary to interfere with the internal procedures of Congress." Exxon Corp. v. FTC, 589 F.2d 582, 590 (D.C.Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979). See United States v. Ballin, 144 U.S. 1, 3-9, 12 S.Ct. 507, 508-10, 36 L.Ed. 321 (1892); Field v. Clark, 143 U.S. 649, 670-73, 12 S.Ct. 495, 496-97, 36 L.Ed. 294 (1891). Cf. Christoffel v. United States, supra, 338 U.S. at 88, 69 S.Ct. at 1449 (Although judicial intervention is appropriate when the failure of Congress to adhere to its own rules implicates constitutional rights, "Congressional practice in the transaction of ordinary business is of course none of (the Court's) concern...."); Murray v. Buchanan, supra, at 22 (with limitation that Congress "may not by its rules ignore constitutional restraints or violate fundamental rights," Congress "may set rules for the conduct of business within the walls of the legislative chambers ... free from interference by the judiciary"). To decide otherwise would subject Congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect of a House or Senate rule. The majority having given its sanction to legislation, and implicitly the process followed in its enactment, a minority might yet frustrate its implementation through litigation based on purported violations of "housekeeping" rules.
 
 
 18
 Were not the express constitutional commitment of rulemaking authority to the houses of Congress sufficient in itself to identify the issues raised here as political questions, "prudential considerations (would) counsel against judicial intervention." Goldwater v. Carter, 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). Among these is concern with "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." Baker v. Carr, supra, 369 U.S. at 217, 82 S.Ct. at 710. To invalidate Pub.L.No.97-93 on the ground that it was enacted in violation of House rules would be to declare as erroneous the understanding of the House of Representatives of rules of its own making, binding upon it only by its own choice. We must assume that the House acted in the belief that its conduct was permitted by its rules, and deference rather than disrespect is due that judgment.
 
 
 19
 B. Complainants next raise a substantive objection to those provisions of Pub.L.No.97-93 that limit FERC's authority to revise rates downward and that permit consumers to be charged for pipeline construction costs prior to delivery of any gas. Complainants assert that the Act thus might prevent FERC from revising tariffs that produce unjust and unreasonable rates and allow natural gas consumers to be forced into investing in the pipeline through pre-billing in violation of fifth amendment protections. While the precise issue has not been addressed by the federal courts and we do not reach the subject for the reasons stated below, complainants urge that consumers as well as investors have a constitutionally protected interest in the reasonableness of regulated rates because "investors' interests provide only one of the variables in the constitutional calculus of reasonableness." Permian Basin Area Rate Cases, 390 U.S. 747, 769, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1969) (citing Covington & Lexington Turnpike Co. v. Sanford, 164 U.S. 578, 596, 17 S.Ct. 198, 205, 41 L.Ed. 560 (1896) (observing with reference to toll road rates that "(t)he public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends")). Complainants would appear to measure such a right in accordance with the proposition, formulated in the context of challenges by investors, that "(p)rice control is unconstitutional ... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt ...." Id. 390 U.S. at 769-70, 88 S.Ct. at 1361 (quoting Nebbia v. New York, 291 U.S. 502, 539, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934)). Complainants also allege that an
 
 
 20
 excessive utility rate takes the property of the patron without due process of law just as effectively as an inadequate rate thus takes the property of the utility. The utility patron is entitled to have his property protected from confiscation to exactly the same degree as the utility operator.
 
 
 21
 Reply Brief for Complainants at 10 (quoting Re Lebanon Telephone Co., 1925B P.U.R. 114, 131 (Ind.Pub.Serv.Comm.1924)).[6]
 
 
 22
 The waiver is not facially invalid. It does not purport to deny consumers just and reasonable rates and its " 'mere enactment' " does not constitute a taking. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981). Pub.L.No.97-93 permits but does not mandate pre-billing, essentially leaving the Natural Gas Act to govern that decision.[7] Further, the Act leaves the "just and reasonable" standard applicable to initial rates. The Act does limit the changes that FERC can make to any final order or rule approving any tariff, but this provision may simply have the effect of allowing investors recovery of prudently-incurred costs, including capital costs, consistent with ordinary ratemaking principles. See FPC v. Hope Natural Gas Co., 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944); Bluefield Water Works & Improv. Co. v. Public Serv. Comm., 262 U.S. 679, 692, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923). The waiver does not prevent all adjustments to rates.
 
 
 23
 Under the waiver, the Commission would retain all authority it would have absent the waiver to take action with respect to examining the justness and reasonableness of the elements of the minimum bill (i.e., actual operating and maintenance expenses, current taxes, and amounts necessary to service debt) and the adequacy of the amounts collected to pay the minimum bill, and revising the project and shipper tariffs to the extent that it determined that those elements were unjustly or unreasonably high, subject to court review, as long as the action taken by the Commission did not impair recovery of the actual operation and maintenance expenses, actual current taxes, and amounts necessary to service debt, including interest and scheduled retirement of debt, for the approved transportation system.
 
 
 24
 H.R.Rep.No.350, 97th Cong., 1st Sess. 22 (1981). Under the Act, FERC nonetheless "retains its power to disallow imprudently incurred costs." Id. at 21. Complainants urge, however, that changed circumstances might render unreasonable previously reasonable rates which the waiver leaves FERC powerless to change. But the circumstances under which complainants fear consumers will be subject to unjust and unreasonable rates are as yet hypothetical; unjust and unreasonable rates are certainly not required by the waiver, and complainants have failed to identify any property "that has allegedly been taken by operation of the Act." Hodel v. Virginia Surface Mining & Reclamation Ass'n, supra, 452 U.S. at 294, 101 S.Ct. at 2369. It is axiomatic that a statute is not facially invalid simply because it is possible to contemplate circumstances in which the application of the statute could result in unconstitutional deprivation when "(t)here is no evidence to support the claim" that the terms of the statute "in themselves" produce that result. Buckley v. Valeo, 424 U.S. 1, 32, 96 S.Ct. 612, 641, 46 L.Ed.2d 659 (1976). The proper inquiry is whether the " 'mere enactment' " of the statute effects such a deprivation, Hodel v. Virginia Surface Mining & Reclamation Ass'n, supra, 452 U.S. at 297, 101 S.Ct. at 2371, and we find none here.
 
 
 25
 Complainants, in fact, present only claims that the statute is capable of unconstitutional application. These claims may be reviewed within 60 days of agency action which poses concrete injury, 15 U.S.C. § 719h(b)(2), but they are not now ripe for decision.
 
 
 26
 Ripeness doctrine is drawn both from Article III limitations on judicial power and discretionary reasons of policy for refusing to exercise existing power. The central concern of both power and discretion is that the tendered case involves uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all.
 
 
 27
 C. Wright, A. Miller & E. Cooper, 13 Federal Practice and Procedure: Jurisdiction § 3532, at 237-38 (1975). Dismissal for lack of ripeness is appropriate where "(n)othing in the record shows that appellants have suffered any injury thus far, and the law's future effect remains wholly speculative." Socialist Labor Party v. Gilligan, 406 U.S. 583, 589, 92 S.Ct. 1716, 1720, 32 L.Ed.2d 317 (1972). Here, no injury is currently being suffered while there is substantial risk that "premature litigation may lead to ill-advised adjudication." C. Wright, A. Miller & E. Cooper, supra, § 3532, at 238. "Problems of prematurity and abstraction may well present 'insuperable obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present." Socialist Labor Party v. Gilligan, supra, 406 U.S. at 588, 92 S.Ct. at 1719 (quoting Rescue Army v. Municipal Court, 331 U.S. 549, 574, 67 S.Ct. 1409, 1422, 91 L.Ed. 1666 (1947)). To the extent that they claim the waiver sanctions an unconstitutional taking, complainants concede that their property has not "already been taken." Reply Brief for Complainants at 15 (emphasis in original). Neither have they yet been subject to unreasonable rates nor are they threatened in any concrete sense. To avoid ill-considered judgments, "the constitutionality of statutes ought not to be decided except in an actual factual setting that makes such a decision necessary." Hodel v. Virginia Surface Mining & Reclamation Ass'n, supra, 452 U.S. at 294-95, 101 S.Ct. at 2369. "Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property," id. at 295, 101 S.Ct. at 2369, which involve weighing various factors in specific settings, and where novel claims are raised. We therefore decline to address complainants' constitutional challenge to the validity of the waiver provision which forbids FERC from revising rates below the minimum bill and the provision which permits pre-billing. ANGTA provides that although "(c)laims alleging the invalidity" of the Act itself must be brought within 60 days of the date a Presidential decision takes effect, complainants remain free in the future to raise "(c)laims alleging that an action (taken pursuant thereto) will deny rights under the Constitution" within 60 days of such action. 15 U.S.C. § 719h.[8] We believe this provision adequately protects ratepayers and other legitimate claimants from preclusion of a fair opportunity to assert deprivations of their alleged constitutional rights arising from implementation of the waiver.
 
 
 28
 C. Complainants' final objection concerns the issuance without notice and comment of an order which included the conditioning plant in the approved pipeline system. Order Amending Conditional Certificate, FERC Docket Nos. CP78-123 et al. (Jan. 4, 1982), J.A. at 538. On the same day, FERC vacated previous orders that excluded the conditioning plant from the pipeline. Order Vacating Prior Order and Closing Docket, FERC Docket No. RM79-19 (Jan. 4, 1982), J.A. at 541; Order Vacating Order No. 31-A, FERC Docket No. RM78-12 (Jan. 4, 1982), J.A. at 542. Complainants contend that FERC's actions, because taken without reconsidering other orders that established a rate-of-return formula on the assumption that the conditioning plant would not be included in rate base, Order No. 31, Order Setting Values for Incentive Rate of Return, Establishing Inflation Adjustment and Change In Scope Procedures, and Determining Applicable Tariff Provisions, FERC Docket No. RM78-12 (June 8, 1979), J.A. at 106; Order No. 31-B On Rehearing, FERC Docket No. RM78-12 (Sept. 6, 1979), J.A. at 449, accomplished a good deal more than simply implementing the mandate of the waiver. Complainants argue that because inclusion of conditioning plant costs in the rate base altered the financial risk, the prior rate-of-return orders were effectively changed, and notice and comment was required. The gravamen of the objection is that the old rate-of-return orders should now be reconsidered. But there has been no agency decision on this issue, and it is not properly raised by the agency's actions on January 4. The three orders issued that day were, in fact, nondiscretionary acts required by the waiver, which specifically provided that the conditioning plant be included in the rate base.[9] As such, notice and comment was "unnecessary," 5 U.S.C. § 553(b)(B), and might even have been "contrary to the public interest," id., given the expense that would have been involved in a futile gesture.
 
 
 29
 Complainants presumably focus on the amendment of the definition of the rate base as the agency action to contest because failure to change the rate-of-return orders is a non-action, and, as such, could not be attacked for failure to afford notice and comment. Complainants, however, by their own admission, will have the opportunity to participate in proceedings attendant to FERC's decision on final certification, including, if the project is approved, the terms and conditions under which construction and operation of the system must proceed. When FERC takes final action on these matters, complainants may then air before this court any remaining dissatisfactions that are cognizable under ANGTA's judicial review provisions. 15 U.S.C. § 719h.[10]
 
 
 30
 On consideration of the foregoing, this cause is hereby dismissed.
 
 
 
 [1]
 Senators: Howard M. Metzenbaum, David F. Durenburger, William Proxmire, Donald W. Riegle, Jr., Paul E. Tsongas, Harrison A. Williams, Jr.; Representatives: Douglas Applegate, Berkley Bedell, John Conyers, Jr., Dennis E. Eckart, Cooper Evans, Thomas R. Harkin, Edward J. Markey, George Miller, Parren J. Mitchell, Ronald W. Mottl, Mary Rose Oakar, Richard L. Ottinger, Donald J. Pease, Frederick W. Richmond, John F. Seiberling, Louis Stokes, Harold L. Volkmer, James Weaver; States of: Iowa, Michigan, Minnesota, Ohio; D. J. Jacobetti, member of Michigan House of Representatives; Dennis J. Roberts, II, Attorney General for Rhode Island; Consumer Energy Council of America; Consumer Federation of America; Energy Action Project of the Citizen/Labor Energy Coalition; Ralph Nader; National Consumers League; Office of Consumers' Counsel, State of Ohio; National Council of Senior Citizens; Ohio Public Interest Campaign
 
 
 [2]
 President Carter's Decision provided:
 The Alcan Pipeline Company, or its successor, and the Northern Border Pipeline, or its successor, shall be publicly held corporations or general or limited partnerships, open to ownership participation by all persons without discrimination, except producers of Alaskan natural gas.
 Executive Office of the President, Energy Policy and Planning, Decision and Report to Congress on the Alaska Natural Gas Transportation System 4-5, 38 (September 1977) (hereinafter "Decision"). A similar prohibition appeared in the section on antitrust compliance. Id. at 38. While waiver of these provisions was designed "to permit producers of Alaska natural gas to participate in the ownership of the Alaska pipeline segment and the gas conditioning plant segment of the approved transportation system," President Reagan's proposal included the requirement that
 any agreement on producer participation may be approved by the Federal Energy Regulatory Commission only after consideration of advice from the Attorney General and upon a finding by the Federal Energy Regulatory Commission that the agreement will not (a) create or maintain a situation inconsistent with the antitrust laws, or (b) in and of itself create restrictions on access to the Alaska segment of the approved transportation system for nonowner shippers or restrictions on capacity expansion(.)
 Text of the Findings and Proposed Waiver of Law (Oct. 15, 1981), reprinted at H.R.Rep.No.350, 97th Cong., 1st Sess. 25 (1981) (hereinafter "Waiver").
 
 
 [3]
 The Decision described the pipeline as commencing "at the discharge side of the gas plant facilities," Decision at 6, and Order No. 45, FERC Docket No. RM79-19 (Aug. 24, 1979), J.A. at 373, construed this definition to exclude the conditioning plant from the pipeline system
 At the same time that President Reagan's proposal sought to include the conditioning plant within the definition of the system, however, the proposed waiver also provided that the variable rate of return applicable to the pipeline in order "to provide substantial incentives to construct the project without incurring overruns," Decision at 37, would not necessarily be applicable to the gas conditioning plant.
 
 
 [4]
 Order No. 31, Order Setting Values for Incentive Rate of Return, Establishing Inflation and Adjustment and Change in Scope Procedures, and Determining Applicable Tariff Provisions, FERC Docket No. RM78-12 at 158-61 (June 8, 1979), J.A. at 106, 266-69, construed the Decision to mean that all segments of the system were to be completed and capable of operation before billing could commence
 
 
 [5]
 Other recommended waivers are described as "technical in nature," Synopsis of Waiver (Oct. 15, 1981) (submitted by the Administration to accompany the Waiver, reprinted at H.R.Rep.No.350, 97th Cong., 1st Sess. 28, 29 (1981), and are not at issue here
 
 
 [6]
 Complainants also view the constitutional right of consumers to just and reasonable natural gas rates as derivative from state laws that create property rights in utility service that cannot be abridged without due process of law. See Reply Brief for Complainants at 13
 
 
 [7]
 The permission to FERC to allow at its discretion, after a finding that such a tariff is just and reasonable under the terms of the Natural Gas Act, a tariff that allows billing to commence in advance of completion of the entire approved transportation system, is strictly limited and intended to waive this condition not more than as follows:
 
 
 [1]
 The Commission may approve a tariff that permits the recovery of the full cost of service of the Canadian segment of the pipeline after its completion and testing and after a date certain selected by the Commission as the date by which the entire system is most likely to begin operation
 
 
 [2]
 The Commission may approve a tariff that permits the recovery of the "minimum bill"-actual operation and maintenance expenses, actual current taxes, and amounts necessary to service debt, including interest and scheduled retirement of debt-for either or both of the Alaska pipeline segment and the Alaska conditioning plant segment, after completion and successful testing and after the date certain mentioned in the preceding paragraph
 The Committee notes that the Commission has not previously found it necessary or just and reasonable to allow such a tariff for a natural gas project. By removing the prohibition incorporated in the President's decision against such a tariff, the Committee does not intend to lead or direct the Commission to a finding in favor of such a tariff. The Commission is instead to apply to its decision whether or not to allow the use of such a tariff for the Alaska segments the same standards that it would have applied had the prohibition never been included in the President's decision.
 H.R.Rep.No.350, 97th Cong., 1st Sess. 16 (1981).
 Exclusiveness of remedy
 (a) Notwithstanding any other provision of law, the actions of Federal officers or agencies taken pursuant to section 719g of this title, shall not be subject to judicial review except as provided in this section.
 Limitations for filing claims
 (b)(1) Claims alleging the invalidity of this (Act) may be brought not later than the 60th day following the date a decision takes effect pursuant to section 719f of this title.
 (2) Claims alleging that an action will deny rights under the Constitution of the United States, or that an action is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right may be brought not later than the 60th day following the date of such action, except that if a party shows that he did not know of the action complained of, and a reasonable person acting in the circumstances would not have known, he may bring a claim alleging the invalidity of such action on the grounds stated above not later than the 60th day following the date of his acquiring actual or constructive knowledge of such action.
 Exclusive jurisdiction of the Special Court; barred claims; precedence and expedition of proceeding; decision; conclusiveness of environmental impact statements
 (c)(1) A claim under subsection (b) of this section shall be barred unless a complaint is filed prior to the expiration of such time limits in the United States Court of Appeals for the District of Columbia acting as a Special Court. Such court shall have exclusive jurisdiction to determine such proceeding in accordance with the procedures hereinafter provided, and no other court of the United States, of any State, territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any such claim in any proceeding instituted prior to or on or after October 22, 1976.
 (2) Any such proceeding shall be assigned for hearing and completed at the earliest possible date, shall, to the greatest extent practicable, take precedence over all other matters pending on the docket of the court at that time, and shall be expedited in every way by such court and such court shall render its decision relative to any claim within 90 days from the date such claim is brought unless such court determines that a longer period of time is required to satisfy requirements of the United States Constitution.
 (3) The enactment of a joint resolution under section 719f of this title approving the decision of the President shall be conclusive as to the legal and factual sufficiency of the environmental impact statements submitted by the President relative to the approved transportation system and no court shall have jurisdiction to consider questions respecting the sufficiency of such statements under the National Environmental Policy Act of 1969.
 15 U.S.C. § 719h.
 
 
 [9]
 Designated portions of President Carter's Decision were to be waived "to include the gas conditioning plant in the approved transportation system and in the final certificate to be issued for the system." Waiver at 25
 
 
 [10]
 See n.8 supra