FRED B. ROTI *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. HAROLD WASHINGTON *et al.*, Defendants-Appellants and Cross-Appellees, (Jacqueline Vaughn *et al.*, Defendants).

First District (3rd Division)   No. 86—1598

Opinion filed October 15, 1986.

RIZZI, P.J., dissenting.

George F. Galland, Jr., of Davis, Barnhill & Galland, Albert C. Maule and Joseph F. Griffin, both of Hopkins & Sutter, and Michael W. McConnell, all of Chicago, for appellants.

William J. Harte, Jeffrey B. Whitt, and Joseph E. Tighe, all of William J. Harte, Ltd., of Chicago, for appellees.

JUSTICE WHITE delivered the opinion of the court:

On June 6, 1986, Alderman Evans of the city council of the city of Chicago proposed a four-part resolution to amend several of the rules of the city council and change the jurisdictions, memberships and chairmanships of the council committees. Following the council vote, Mayor Harold Washington declared that the resolution passed. Plaintiffs, 25 aldermen who voted against the resolution, then filed this suit against the mayor and the 25 aldermen who voted in favor of the resolution. They seek a judgment declaring that the resolution failed and that the committees retained the chairmen, memberships, and jurisdictions that they had prior to June 6, 1986.

The trial court granted defendants' motion for summary judgment on the grounds that the resolution passed and the mayor's rulings were proper. However, the trial court also stayed the effect of its order until this court should have an opportunity to rule on appeal from the order. Defendants appeal from the stay order, and plaintiffs cross-appeal from the decision to grant defendants' motion for summary judgment. The stay order expires under its own terms with our decision on the merits of plaintiffs' cross-appeal. Therefore, we do not address the propriety of the stay order.

I

In 1981 the city council redistricted Chicago wards. A group of Chicago citizens filed a suit in Federal court asserting that the remap violated the Voting Rights Act (42 U.S.C. sec. 1971 *et seq.* (1982)). The Federal district court ordered minor changes in ward boundaries, and the plaintiffs therein appealed. (*Ketchum v. Byrne* (7th Cir. 1984), 740 F.2d 1398, 1401-02, *cert. denied* (1985), 471 U.S. 1135, 86 L. Ed. 2d 692, 105 S. Ct. 2673.) Aldermanic elections were held in April 1983 while the appeal was pending. On May 2, 1983, at the first council meeting after the elections, 29 of the aldermen, including all of the plaintiffs in the instant case, voted to change the number, jurisdictions, memberships, and chairmen of the committees of the city council. They then voted in favor of a revised version of council Rule 36:

under the council rules before May 1983, a vote of a simple majority was sufficient to remove committee chairmen; under the revised rule, a vote of two-thirds of the aldermen was necessary to remove committee chairmen. The 29 aldermen then voted to reenact council Rule 48, which required a vote of two-thirds of the aldermen to change any rule. This court upheld the validity of the actions of the 29 aldermen. *Roti v. Washington* (1983), 114 Ill. App. 3d 958, 971, 450 N.E.2d 465.

In August 1984 the United States Court of Appeals for the Seventh Circuit found that the remap ordered by the district court did not correct the violations of the Voting Rights Act. (*Ketchum v. Byrne* (7th Cir. 1984), 740 F.2d 1398, 1412.) In December 1985 the district court approved a new ward map that substantially altered the boundaries of seven wards, and it ordered special elections for those wards. The special elections took place in March and May 1986.

Shortly after the new members of council were seated, Alderman Evans proposed the resolution at issue in this case. In the first part of the resolution, he proposed an amendment of Rule 48 to allow amendment of the rules by the vote of a simple majority. Defendant aldermen voted in favor of the proposed amendment, and plaintiff aldermen voted against the proposal. Mayor Washington voted in favor of the amendment and declared that the first part of the resolution passed, 26 votes to 25 votes. Plaintiff Alderman Burke challenged the ruling of the chair, arguing that a vote of two-thirds of the aldermen was needed to pass the resolution. Defendant aldermen voted to sustain the mayor's ruling, and plaintiff aldermen voted to overrule. Mayor Washington voted to sustain the ruling and declared that his ruling had been sustained. Alderman Burke again challenged the ruling, arguing that the mayor could not vote to sustain his own ruling. Again plaintiffs voted to overrule the mayor, defendants voted to sustain, and Mayor Washington declared that his ruling was sustained by a vote of 26 to 25.

In the second part of his resolution, Alderman Evans proposed an amendment of Rule 36 to allow removal of committee chairmen by a vote of a simple majority of the council. Defendants voted in favor of the second part of the resolution, and plaintiffs voted against it. Plaintiffs again challenged the chair's ruling that the resolution passed, and the same vote ensued. In the third and fourth parts of the resolution, Alderman Evans proposed changes in the number, jurisdictions, memberships, and chairmen of the committees of the city council. Plaintiffs again voted against parts three and four of the resolution, and they again challenged the mayor's rulings that those parts of the resolution passed.

## II

Plaintiffs argue on appeal that, under the rules of the city council, they remain chairmen of the council committees. Defendants contend that the trial court did not have jurisdiction to hear this case because the case presents a political question and the plaintiffs have not alleged any judicially cognizable injury.

■ Illinois circuit courts have jurisdiction over all "justiciable matters." (Ill. Const. 1970, art. VI, sec. 9.) The doctrine of justiciability in Illinois closely parallels the doctrine of justiciability developed in the Federal courts. (See, *e.g.*, *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 747, 359 N.E.2d 1137.) Both Illinois courts and Federal courts have held that they lack jurisdiction to decide political questions. (*Metzenbaum v. Federal Energy Regulatory Com.* (D.C. Cir. 1982), 675 F.2d 1282, 1287; *Zurn v. City of Chicago* (1945), 389 Ill. 114, 126, 59 N.E.2d 18; *Malkin v. City of Chicago* (1955), 6 Ill. App. 2d 151, 155-56, 127 N.E.2d 145.) Our supreme court has stated:

> "It is not within the jurisdiction of a court of equity to interfere with the public duties of the departments of government. [Citation.] Its jurisdiction pertains only to questions of the maintenance of civil rights,—property rights, as contradistinguished from political rights. [Citations.] It can have no jurisdiction to determine political questions between the mayor and council of a city concerning the appointment and removal of officers, nor can it exercise jurisdiction in determining the right of a party to an office." (*Heffran v. Hutchins* (1896), 160 Ill. 550, 554, 43 N.E. 709.)

However, our supreme court has also stated: "The mere fact that political rights and questions are involved does not create immunity from judicial review." *Donovan v. Holzman* (1956), 8 Ill. 2d 87, 93, 132 N.E.2d 501.

The Supreme Court of the United States traced guidelines for determining whether a case presents a nonjusticiable political question in *Baker v. Carr* (1962), 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691. "The nonjusticiability of a political question is primarily a function of the separation of powers," which must be decided following "case-by-case inquiry." (369 U.S. 186, 210-11, 7 L. Ed. 2d 663, 682, 82 S. Ct. 691, 706.) Therefore, we have no jurisdiction to decide a question which is appropriately resolved by a branch of government other than the judiciary. The court listed six different grounds for finding that the judiciary should not decide a given question. (369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710.) Defendants maintain that we lack jurisdiction to decide this case under the first test listed in *Baker* be-

cause there is a "textually demonstrable constitutional commitment of the issue" to the city council. 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710.

In *Rock v. Thompson* (1981), 85 Ill. 2d 410, 426 N.E.2d 891, petitioners contended that the purported election of a senator to the office of president of the Senate did not comply with Senate rules. Article IV, sec. 6(d), of the Illinois Constitution of 1970 provides in part: "Each house shall determine the rules of its proceedings *** and choose its officers." Relying upon this constitutional provision, respondents in *Rock* argued that the court had no jurisdiction to " 'enter into the legislative thicket' on matters relating to the organization and operation of the Senate, a legislative body." (85 Ill. 2d 410, 417, 426 N.E.2d 891.) The court rejected this argument stating that "the doctrine of separation of powers does not prevent the court from ascertaining compliance with or mandating performance of constitutional duties" (85 Ill. 2d 410, 417, 426 N.E.2d 891), and held that it had jurisdiction to decide whether the president of the Senate had been elected in accord with Senate rules. 85 Ill. 2d 410, 419, 426 N.E.2d 891.

■ Section 3—11—11 of the Illinois Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 3—11—11) grants city councils the power to make their own rules, but neither the Constitution of Illinois nor Illinois statutes expressly mention the creation of council committees. The defendants argue that "the constitution and statutes of Illinois leave the creation and membership of City Council committees to the unfettered political discretion of the Council itself." Since the constitutional language cited above in *Rock* was held not to create in the selection of a senate president a "textually demonstrable constitutional commitment of the issue" sufficient to deprive the court of jurisdiction, *a fortiori* the statutory language of the Illinois Municipal Code does not deprive this court of jurisdiction over the instant case involving the selection of the city council committees.

The court in *Rock* asserted:

> " '[W]hen a constitutional or statutory violation on behalf of the executive or legislative branch is asserted, the courts obviously have the obligation to correct it.' " (*Rock v. Thompson* (1981), 85 Ill. 2d 410, 417, 426 N.E.2d 891.)

Applying this principle, we find that the Illinois Constitution and the Illinois Municipal Code do not preclude us from determining whether the city council elected its committee chairmen in accord with its rules.

Neither should we refuse jurisdiction on the basis of any other concern related to the separation of powers. In the instant case the 25 plaintiff aldermen claim that through their "No" votes, the council has

resolved the issues in this case in their favor by failing to enact the resolution at issue and by overruling the mayor's contrary rulings; the 25 defendant aldermen and the mayor claim that by their "Aye" votes, the council resolved the same issues in the opposite manner. With that impasse the council has not and cannot resolve the issues presented to this court. Half of the aldermen of the city council have asked this court to resolve the difficulty. As Justice Simon stated in his concurrence in *Rock*:

> "[I]t was clear that the Senate was unable to resolve its impasse without help, and the judiciary was the only body it could turn to for help. Had we not acted, the work of the Senate would have gone undone or been open to challenge, and Senators, once having resorted to physical conflict in trying to resolve the controversy, might have continued to do so. Having been presented with this controversy, it was better for us to decide than to avoid decision." (*Rock v. Thompson* (1981), 85 Ill. 2d 410, 431-32, 426 N.E.2d 891 (Simon, J. concurring).)

We believe that we show no disrespect for coordinate branches of government, and we do not usurp powers belonging exclusively to any other branch of government, by assuming jurisdiction under the circumstances presented by the instant case. Therefore, under our constitutional scheme of separate powers, we have jurisdiction to decide this case. *Baker v. Carr* (1962), 369 U.S. 186, 210, 217, 7 L. Ed. 2d 663, 681-82, 686, 82 S. Ct. 691, 706, 710.

### III

Plaintiffs maintain that the resolution by which defendants sought to amend Rule 48 failed because fewer than two-thirds of the members of the city council voted in favor of the amendment. The trial court held that a simple majority of the city council had the power to amend Rule 48:

> "The power to enact is a power to repeal, and a bylaw requiring a two-thirds vote of members present to alter or amend the laws of the society may itself be altered, amended or repealed by the same power which enacted it." (*Supreme Lodge Knights of Pythias v. Trebbe* (1899), 179 Ill. 348, 354, 53 N.E. 730, quoting *Richardson v. Union Congregational Society* (1877), 58 N.H. 187, 188.)

Plaintiffs argue that we should distinguish *Trebbe* on the grounds that the body whose rules were amended in *Trebbe* was a private group, not a public entity like the city council. We are not aware of any Illinois case which has squarely decided whether a public body's rule, requiring

a vote of two-thirds of the assembly to change the assembly's rules, may itself be changed by a vote of a simple majority.

■ However, several other jurisdictions have addressed this question. In *State ex rel. Kiel v. Riechmann* (1911), 239 Mo. 81, 142 S.W. 304, the defendants, members of the Republican city committee of the city of St. Louis, voted to change certain committee rules in the middle of its officers' term of office. Rule 1 stated that no officer could be removed without the vote of 18 committee members; Rule 15 provided that the rules could not be "repealed or altered unless by a three-fourths majority vote of all the members." (239 Mo. 81, 87, 142 S.W. 304, 305-06.) A committee member proposed a resolution to amend Rule 15 to require only a majority vote to amend the rules. The committee members voted 14 to 12 in favor of the motion, and by the same vote they amended Rule 1 to require only a majority vote to change the committee's officers. The court addressed the question:

> "[D]oes a rule requiring a three-fourths vote to change the rules prevent a majority vote from changing that rule? Can a majority vote restrict its own power by such a rule, so that after such restriction the majority loses its potentiality? \*\*\* [T]he power to make carries with it the right and power to unmake. The same power which can make rules in the first instance can directly attack and unmake or repeal such rules. \*\*\* [If] by a bare majority rules are adopted, and among them is a rule saying that no change shall be made therein, except upon a three-fourths vote of the members, then in such case, before the majority could proceed to enact new rules, it must first directly attack this rule which limited the power of the bare majority. (239 Mo. 81, 97-98, 142 S.W. 304, 309.)

Similarly, the supreme courts of New Hampshire, Pennsylvania and Maryland have held that if the majority of a public body can make a rule imposing a supermajority requirement for the alteration of rules, a majority may also amend that rule. (*Richardson v. Union Congregational Society* (1877), 58 N.H. 187, 53 N.E. 730; *Commonwealth ex rel. Mayor of Lancaster* (Penn. 1836), 5 Watts 152, 155-56; *Zeiler v. Central Ry. Co.* (Md. 1896), 84 Md. 304, 35 A. 932.) Plaintiffs have cited no case which holds that an assembly's rule imposing a supermajority requirement for various actions may not itself be changed by the vote of a simple majority. We believe that our supreme court in *Supreme Lodge Knights of Pythias v. Trebbe* (1899), 179 Ill. 348, 354, 53 N.E. 730, accurately restated the common law principle applicable to both public and private bodies. The trial court correctly applied that principle to the facts of this case and found that the resolution to amend Rule 48

passed by a vote of 26 to 25.

## IV

Plaintiffs maintain that the parts of the resolution in which Alderman Evans proposed changes in Rule 36 and in the structure of the committees failed because those parts of the resolution received insufficient votes. Under amended Rule 48, the rules of the city council may be changed with the "concurrence of a majority of all the Aldermen entitled by law to be elected." Only 25 aldermen voted in favor of the second, third, and fourth parts of Alderman Evans' resolution, while 25 aldermen voted against those parts. Plaintiffs maintain that, under the terms of Rule 48 as amended, Mayor Washington was not entitled to vote even in the case of a tie and therefore the resolution won the votes of only half of the council, not the requisite majority.

Mayor Washington ruled that he could vote under the terms of Rule 48 as amended. Since he voted in favor of all parts of the resolution, he ruled that the resolution passed. When Mayor Washington's rulings were challenged, 25 aldermen voted to sustain the chair's ruling and 25 voted to overrule. Plaintiffs maintain that Mayor Washington was not entitled to vote on the appeal under Rule 12 and, since Rule 12 provides that the chair's ruling is overruled unless a majority of the council votes to sustain, the council overruled Mayor Washington.

■■ The Illinois Municipal Code provides that the mayor "shall not vote on any ordinance, resolution or motion except: (1) where the vote of the aldermen has resulted in a tie; or (2) ***; or (3) ***. In each instance specified, the mayor shall vote." (Ill. Rev. Stat. 1985, ch. 24, par. 3—11—14.) Where municipal ordinances conflict with State law, the dictates of the State legislature prevail. (*City of Chicago v. Union Ice Cream Manufacturing Co.* (1911), 252 Ill. 311, 313, 96 N.E. 872.) Thus, the city council could not deprive the mayor of this right and duty to vote in case of a tie even if it had intended to do so in enacting Rule 48. We find that Mayor Washington appropriately interpreted the rule in a manner consistent with the Illinois Municipal Code, and his votes in favor of all parts of the resolution must be counted as the tie-breaking votes. Similarly, the council could not relieve the mayor of his duty to vote in case of a tie under the terms of Rule 12; Mayor Washington appropriately cast the tie-breaking votes, which established that the city council interpreted its Rules 48 and 12 in a manner consistent with statutory law.

The city council effectively amended its Rule 48 by a vote of 26 to 25; it then effectively amended its rules relating to the structures of

committees, by votes of 26 to 25, in accord with amended Rule 48. The trial court order granting defendants' motion for summary judgment is affirmed. The stay order expires by its own terms with our resolution of the appeal from the order granting summary judgment.

Affirmed in part, and vacated in part.

McNAMARA J., concurs.

PRESIDING JUSTICE RIZZI, dissenting:

I believe that this case involves only political questions and not justiciable issues and that therefore the separation of powers precludes us from judicially deciding the questions. (See Ill. Const. 1970, art. II, sec. 1.) I would vacate the order from which the appeal is being taken, dismiss the case, and allow the mayor and his supporters to continue to function in the city council pursuant to the orders and resolutions passed by the city council at its June 6, 1986, meeting.

I feel that certain political and politically related facts that do not appear in the majority opinion are relevant. In order to give these additional facts continuity, and for ease of understanding, I will integrate the additional facts with the facts that have been stated by the majority.

Chicago is divided into 50 aldermanic wards, each with nearly equal population. The city council must redistrict Chicago's wards on the basis of new census data by December 1 of the year following the taking of a national census. (Ill. Rev. Stat. 1981, ch. 24, pars. 21—36, 21—38.) As a result of the census taken in 1980, it was necessary for the city council to devise a redistricting plan by December 1, 1981. After the city council redistricted Chicago's wards in 1981, several black and hispanic residents filed a law suit in the United States district court alleging in part that the new map violated the Voting Rights Act (42 U.S.C. sec. 1971 (1982).) The district court entered judgment in favor of the plaintiffs on their Voting Rights Act claim and then adopted a new map. (*Ketchum v. Bryne* (7th Cir. 1984), 740 F.2d 1398, *cert. denied* (1985), 471 U.S. 1135, 86 L. Ed. 2d 692, 105 S. Ct. 2673.) The plaintiffs appealed because they felt that the relief granted was insufficient.

While the appeal was pending, the aldermanic election took place on April 12, 1983. After the election the new city council met for the first time, on May 2, 1983. At the council meeting there emerged an alliance of 28 white aldermen and one hispanic alderman (the 29 alliance) who opposed the chairman of the meeting, Chicago's first black mayor, Harold Washington. The mayor and 21 aldermen supporting the

mayor, including all 16 black aldermen, attempted to abruptly adjourn the city council meeting. The mayor and his supporters left the meeting after the mayor proclaimed that the meeting was adjourned. However, the 29 alliance continued the meeting and by a vote of 29 to 0 amended the city council rules to give the 29 alliance control of the city council. The 29 alliance increased the number of standing council committees from 20 to 29, assigned itself voting control of all the standing council committees, and made its own members chairmen of virtually all of the 29 committee chairmanships. One of the leaders of the 29 alliance emerged as chairman of the city council's most powerful committee, the committee on finance. He replaced a longtime chairman who is black. The 29 alliance also amended certain city council rules which had the effect of making it unlikely that the mayor's alliance would be able to undo the changes that the 29 alliance made even if the 29 alliance would later be reduced from a majority to a minority of the city council. Having given itself control of the city council, the 29 alliance enacted Rule 48, which requires a two-thirds majority vote to amend the rules that the 29 alliance had just passed by less than a two-thirds majority vote.[1]

At the time of the May 2, 1983, meeting, the 29 alliance included aldermen from the seven wards that were principally at issue in the *Ketchum* case (*Ketchum v. Byrne* (7th Cir. 1984), 740 F.2d 1398), that was pending on review. On August 14, 1984, the court of appeals reversed the district court's judgment in part and remanded the *Ketchum* case with directions to remedy the "illegal dilution of minority voting strength accomplished by the city council map." *Ketchum v. Byrne* (7th Cir. 1984), 740 F.2d 1398, 1412. Accordingly, on December 27, 1985, the district court approved a new map for Chicago's wards that made significant demographic changes in seven wards. Also, on December 30, 1985, the district court ordered special aldermanic elections in the seven wards.

As a result of the special aldermanic elections, four of the aldermen who had been part of the 29 alliance lost their seats as aldermen to persons supporting the mayor. Thus, the 29 alliance became the 25 alliance. This political fact changed the balance of power in the city council because, as the 29 alliance was reduced to 25, the number of aldermen supporting the mayor was increased to 25, and "the mayor shall

---

[1]Rule 48 of the 1979-83 city council provided: "These rules *** shall not be repealed, altered or amended unless by concurrence of 2/3 of all the aldermen entitled by law to be elected." At the May 2, 1983, meeting of the 1983-87 city council, the 29 alliance, which constituted less than a two-thirds majority of the city council, reenacted Rule 48 as part of the rules of the 1983-87 city council.

vote" where the vote of the aldermen has resulted in a tie (Ill. Rev. Stat. 1985, ch. 24, par. 3—11—14).

After the mayor and his 25 alliance gained a political edge in the city council, the city council meeting of June 6, 1986, took place. The events that occurred at that meeting are explicitly involved in this appeal. Generally, the events that took place at the June 6, 1986, meeting amounted to the newly comprised city council changing the rules and committee arrangements that had previously been passed by the 29 alliance at the May 2, 1983, meeting. Simply, the rules and committee arrangements were changed to favor the mayor and his 25 alliance instead of the opposition 25 alliance.

At the June 6, 1986, meeting, the newly constituted city council first voted to amend Rule 48. By a vote of 26 to 25, including the mayor's tie-breaking vote, the city council changed Rule 48 to allow the city council rules to be amended by a vote of "a majority of all aldermen entitled by law to be elected," rather than requiring a two-thirds majority to amend the rules. Next, the newly constituted city council voted by the same 26 to 25 vote to amend Rule 36. The amendment reduced the vote needed to remove committee chairmen and vice-chairmen from two-thirds to a simple majority. After doing that, the city council voted 26 to 25 to make certain additional rule changes, including one which abolished or merged 11 committees and created 2 new committees. Finally, the city council rescinded the existing committee assignments and assigned new chairmen and vice-chairmen to certain committees. Under the new lineup the mayor captured majority control of all council committees, and the majority of the committees were chaired by supporters of the mayor. The reorganization stripped one of the leaders of the opposition 25 alliance of crucial budget powers as finance committee chairman. These powers were given to one of the leaders of the mayor's 25 alliance who is black.

At the June 6, 1986, city council meeting, there was a floor debate, and the city council considered and formally passed on the interpretation and meaning of its own rules and the changes that were made. Specifically, the city council debated and rejected the contention of the opposition 25 alliance that a 26 to 25 majority was not sufficient to nullify Rule 48, as it had been passed by the then opposition 29 alliance. As the majority opinion correctly shows, there is no constitutional, statutory or common law rule of law which establishes that a majority of any body cannot nullify what a prior majority of the body had done. Surely, if one majority created the rule, another majority should be able to nullify it. See *Supreme Lodge Knights of Pythias v. Trebbe* (1899), 179 Ill. 348, 354, 53 N.E. 730, 732; *State ex rel. Kiel v.*

*Riechmann* (1911), 239 Mo. 81, 142 S.W. 304.

At the June 6, 1986, meeting, the city council also debated and rejected the contention of the opposition 25 alliance that Rule 12 precludes the mayor from voting to break ties on appeals from his ruling as chairman of the city council. Rule 12 provides: "Any member may appeal to the Council from a ruling of the Chair, and the member making the appeal may state his reason for the same and the Chair may explain his ruling; but there shall be no debate on the appeal and no other member shall participate in the discussion. The Chair shall then put the question, 'Shall the decision of the Chair be sustained?' If a majority of the members present vote 'Yes,' the decision of the Chair is sustained, otherwise the decision of the Chair is overruled."

The opposition 25 alliance maintained at the meeting that the mayor is not a member of the council within the meaning of Rule 12 and therefore cannot vote in case of a tie. Here it should be noticed that Rule 12 states that if a majority of the *members* present vote "Yes," the decision of the chairman is sustained; Rule 12 does not state that if a majority of the *aldermen* present vote "Yes," the decision of the chairman is sustained. This is a significant distinction because, by statute, the city council consists of the aldermen and the mayor, and where the vote of the aldermen has resulted in a tie, the mayor shall vote. (Ill. Rev. Stat. 1985, ch. 24, par. 3—11—14.) Thus the position that was taken by the opposition 25 alliance at the meeting was not only rejected by the city council itself but it is not tenable.[2]

---

[2]If I were to decide this case on the merits I would agree with the result of the majority on this point, but only for the reasons that I have stated. I believe that the majority's reason for concluding that the mayor could vote in case of a tie vote is questionable. The majority states that the "city council could not deprive the majority of this right and duty to vote in case of a tie even if it had intended to do so in enacting Rule 48" or Rule 12 because "[w]here municipal ordinances conflict with State law, the dictates of the State legislature prevail. (*Chicago v. Union Ice Cream Manufacturing Co.* (1911), 252 Ill. 311, 313, 96 N.E. 872.)" The *Union Ice Cream Manufacturing Co.* case was decided before the 1970 Constitution of the State of Illinois was adopted. The 1970 Constitution of the State of Illinois provides: "Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." (Ill. Const. 1970, art. VII, sec. 6(i).) Since the majority has not shown how this home rule provision of the Constitution is to be applied here, I believe the majority's rationale is questionable. Plainly, the *Union Ice Cream Manufacturing Co.* case is not applicable. In *Sommer v. Village of Glenview* (1980), 79 Ill. 2d 383, 392, 403 N.E.2d 258, 262, the court stated: "We have repeatedly held that 'a home rule unit's exercise of its power will supercede any conflicting pre-1970-Constitution legislation.' " The legislation relied upon by the majority is pre-1970-Constitution legislation.

The political and other facts which I have stated clearly demonstrate that this case involves political questions and not justiciable issues. Specifically, this case involves solely the internal political struggles of the city council of Chicago, a legislative body, and the rules of proceeding in the city council. In this regard, section 3—11—11 of the Illinois Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 3—11—11), states that the "city council shall determine its own rules of proceeding." Moreover, the city council is under no constitutional, statutory or common law requirement to create committees. Thus, the rules of proceeding and the decisions regarding the creation of committees, what committees the city council should have, what the composition or authority of the committees should be, and who should be chairman of the committees are all within the unbridled political discretion of the city council. This is as it should be. Politics, with all of the word's good and bad connotations, is how the legislative branch of government works. This is an important recognition because it evinces that the questions that are involved in this case arise from matters that occur within the contours of the legislative process.

Under our constitution, the legislative, executive and judicial branches of government are separate and no branch shall exercise powers properly belonging to another.[3] Since the questions in this case arise from matters that occur within the contours of the legislative process, under the separation of powers in the constitution the final determination of the questions is constitutionally committed to the legislative branch of government. Thus, the questions are political, and they may not be finally decided by the judicial branch of government because of the separation of powers. See *Davis v. Bandemer* (1986), 478 U.S. ___, 92 L. Ed. 2d 85, 106 S. Ct. 2797; *Baker v. Carr* (1962), 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710;[4] G. Gunther, Constitutional Law 396-98 (11th ed. 1985).

In my opinion, the majority treats the separation of powers principle with superficiality rather than with the reverence it deserves as one

---

[3]In this opinion reference is made to the United States Constitution with regard to the separation of powers. However, the discussion applies as well to the Illinois Constitution, which expressly provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." (Ill. Const. 1970, art. II, sec. 1.) See 11 Ill. L. & Prac. *Constitutional Law* sec. 81 (1981); 16 C.J.S. *Constitutional Law* sec. 111 (1984).

[4]In *Baker v. Carr*, the court stated: "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department." 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710.

of the safeguards to our unique form of government. (See *Bowsher v. Synar* (1986), 478 U.S. ___, ___, 92 L. Ed. 2d 583, 593-94, 106 S. Ct. 3181, 3186.) This is the underlying fault in the majority's erroneous conclusion that the separation of powers is not applicable here.

The majority relies upon *Rock v. Thompson* (1981), 85 Ill. 2d 410, 426 N.E.2d 891. In *Rock*, the mandamus petition alleged "that when the Senate action was taken on January 15, 1981, no quorum was present *as required by article IV, section 6(a), of the 1970 Constitution*." (Emphasis added.) (85 Ill. 2d 410, 419, 426 N.E.2d 891, 897.) Thus, as expressly appears in the court's opinion in *Rock*, "the petition alleges not merely procedural deficiencies, but substantive constitutional defects." (85 Ill. 2d 410, 419, 426 N.E.2d 891, 897.) In holding that it had jurisdiction to hear the case, the court stated: "It is the duty of the judiciary to construe the Constitution and determine whether its provisions have been disregarded by the actions of any of the branches of government." (85 Ill. 2d 410, 418, 426 N.E.2d 891, 896.) Where there is a showing of an explicit and clear constitutional imperative to decide a case, there is no question that the judiciary will intervene and decide the case even though it may involve a political question. (See *Baker v. Carr* (1962), 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691.) However, in the present case there is no allegation by the plaintiffs that there has been a constitutional violation of any kind. Rather, the plaintiffs have alleged mere procedural deficiencies at the city council meeting of June 6, 1986. Here, unlike in *Rock*, there is no duty of the judiciary to construe the constitution and determine whether its provisions have been disregarded by the actions of any of the branches of government.

In addition, in *Rock* the petitioners and the respondents *agreed* that the judiciary should decide the case. In *Rock*, Justice Simon stated: "both sides urgently asked us to judge the case, and agreed that we should decide it on the merits. We need not hesitate, therefore, over the propriety of judicial interference with other branches of government." (*Rock v. Thompson* (1981), 85 Ill. 2d 410, 431, 426 N.E.2d 891, 902 (Simon, J., concurring).) In the present case, the mayor and his supporters fiercely argue that this case presents only political questions and that the questions presented are not justiciable because of the separation of powers. Thus, *Rock* has no application to the question of the propriety of judicial interference with other branches of government in the present case.

Next, the majority concludes that since "[h]alf of the aldermen of the city council have asked this court to resolve the difficulty," it means that the city council is not able to resolve its impasse without judicial

help. The majority then states that therefore "we show no disrespect for coordinate branches of government, and we do not usurp powers belonging exclusively to any other branch of government, by assuming jurisdiction." I disagree.

The judiciary should not be deciding this case merely because some members of the city council claim that they have reached an impasse due to their own recalcitrance or misbehavior. In such instances the judiciary must simply step aside and let the warring political factions resolve their differences through the political processes and hard political bargaining and compromise. If they fail, they need never respond to the judiciary, but they will surely answer to the people who elected them as legislators.

I believe that the majority's well-intentioned, but ill-advised, judicial intervention into local legislative politics will do nothing but encourage the highly charged political factions to continue to race pell-mell to and from the courthouse for court decisions and reversals on a morass of political questions and appointments. This will surely thrust the courts deeper into the thicket of partisan political affairs and end up bungling rather than curing the work of the local legislative government. As our Founding Fathers recognized when they gave us our Constitution, the legislative branch of government may not work perfectly, but it plainly works best when it is not interfered with by the judiciary. Thus, the majority's reasons for deciding the political questions in this case are simply not tenable. The majority should have deferred to the separation of powers.

In not deferring to the separation of powers, the majority overlooks the celebrated warning of Montesquieu that " 'there is no liberty if the power of judging be not separated from the legislative and executive powers.' " The Federalist No. 78, at 466 (A. Hamilton) (C. Rossiter ed. 1961), quoting 1 Montesquieu, Spirit of Laws, at 181 (1748).) We should not forget that it was in an exercise of their liberty that the people elected aldermen, and not judges, to run the city council. By choosing to decide this case judicially, the majority is transgressing upon the liberty of the people to have their elected legislators in the city council conduct their affairs. Moreover, we must remember that the judiciary is the branch of government that was intended by the Founding Fathers to be the least powerful.[5] The Federalist No. 78, at

---

[5]The modern formulation for the separation of powers in government is attributed to the ideas of both the English philosopher John Locke and the French theorist Montesquieu. IX Encyclopedia Britannica, Micropaedia 61 (15th ed. 1974); H. Hart, The 100 - A Ranking Of The Most Influential Persons In History 263. However, the explicit separation of powers in the American constitution is due to the influence of Montes-

465 (A. Hamilton) (C. Rossiter ed. 1961). Here, by arrogating to itself the authority to dictate how the city council should conduct its affairs, the majority is acting as if the branch of government intended to be the least powerful is the most powerful.

There is still another factor that must be considered. An independent judiciary is indispensible to the separation of powers. See Kaufman, *Maintaining Judicial Independence: A Mandate to Judges*, 66 A.B.A.J. 470 (1980). In order to preserve the independence of the judiciary, judges must take affirmative action to insulate the judicial process from all interference from other sources. Here, the majority's demonstrated proclivity to decide political questions invites, rather than insulates judges from, interference with the judicial process. The invited interference to which I refer would include attempts by local political factions to exert political influence upon members of the judiciary who are seeking to be retained as judges in pending elections while the judges have cases before them which involve solely political questions. This is the kind of unseemly spectacle which the majority opinion breeds. Thus the majority has not taken the type of affirmative action that is necessary to uphold the independence of the judiciary. This is an important consideration because without the "complete independence of the courts of justice" there can be no separation of powers. See The Federalist No. 78, at 466 (A. Hamilton) (C. Rossiter ed. 1961).

Accordingly, I would hold that this case presents political questions and not justiciable issues and that the separation of powers precludes the judiciary from exercising its jurisdiction. I would vacate the order of the trial court, dismiss the case, and allow the mayor and his supporters to continue to function in the city council pursuant to the orders and resolutions passed by the city council at its June 6, 1986, meeting.

---

quieu upon the Founding Fathers. 17 Encyclopedia Britannica, Macropaedia 611 (15th ed. 1974). When speaking of the three departments of power, Montesquieu stated: "Of the three powers above mentioned, the judiciary is next to nothing." 1 Montesquieu, Spirit of Laws, at 186 (1748).